# MITZI JEAN LYKINS v. STATE OF MARYLAND

[No. 111, September Term, 1979.]

*Decided June 23, 1980.*

The cause was argued before SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*William H. Kenety, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Neal Myerberg, State's Attorney for St. Mary's County,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. COLE and DAVIDSON, JJ., concur in part and dissent in part. DAVIDSON, J., filed an opinion concurring in part and dissenting in part at page 87 *infra,* in which COLE, J., joins.

We shall here hold that there is a difference between the circumstances which bar a prosecution, requiring dismissal of an indictment, from those which only bar a prosecutor, although both may involve actions of the prosecutor. In the former situation the indictment or information is dismissed. In the latter situation there is no dismissal of the indictment or information, but the prosecutor is disqualified and the appointment of a special prosecutor becomes necessary. Hence, we shall modify and affirm the judgment of the Court of Special Appeals in *State v. Lykins,* 43 Md. App. 472, 406 A.2d 289 (1979).

Mitzi Jean Lykins was indicted by the Grand Jury of St. Mary's County for assault and battery and assault with intent to murder George Leo Welch, Jr.[1] The incident took

---

1. We infer that the stab wounds sustained by the victim were sufficiently severe to require his removal to the shock trauma unit of University Hospital in Baltimore since we note in the record an attempt to obtain his medical records from that unit.

place on January 29, 1979. Neal P. Myerberg, the present State's Attorney for St. Mary's County, became such on January 8, 1979.

Lykins moved to dismiss the indictment. The motion recited that she had been separated from her husband, William Anderson, since May 1978; that prior to that separation she had "maintained a social relationship with the alleged victim in the [case at bar], and immediately subsequent to the said separation, commenced a coresidence with the said alleged victim;" that upon the separation she "commenced a course of conduct designed to effect the termination of her marriage to the said Anderson, including the retention of an attorney;" that the attorney retained by her was Neal P. Myerberg; that she imparted to him "various information regarding her personal and domestic history, including her relationship with the aforesaid Welch, in a confidential relationship protected by the attorney-client privilege;" that the case at bar "is inextricably related to the personal and domestic history of the defendant;" that the evidence upon which the indictment is laid was presented to the Grand Jury for St. Mary's County by Neal P. Myerberg as State's Attorney for that county; that "[t]he presentation of evidence in a matter involving the defendant's personal and domestic life, particularly in a secret proceeding to which the defendant is denied access and of which no record is kept, is tantamount to a breach of the attorney-client privilege;" that "[t]he prosecution of these proceedings by the defendant's attorney is a related matter [which] would raise the spectre of breach of the attorney-client privilege and would deny the defendant her right against self-incrimination and due process of law insofar as the defendant would be subject to cross-examination in an accusatory criminal proceeding by her attorney in a related matter should the defendant elect to testify in her own defense;" and that prosecution of Lykins by Myerberg or his assistants (two of whom are members of the law firm which succeeded Myerberg's practice) "constitutes a conflict of interest with the representation of the defendant by Mr. Myerberg's law firm in the defendant's

domestic proceedings, under the premise, *inter alia,* that conviction in these proceedings resulting in a sentence to imprisonment for three years or more, would render the defendant herein an actionable defendant in proceeding for divorce." [2]

Myerberg, the State's Attorney, was called as a witness by Lykins when the motion came on for hearing in the circuit court. In response to a question as to whether he was "familiar with Mitzi Jean Lykins," he said that he "never know her as Mitzi Jean Lykins until [he] met her in January, but [he was] familiar with her," having known her as Mitzi Jean Anderson. He stated that he became her attorney in July of 1978 when he prepared a separation agreement. He was asked whether in the course of his representation he "discuss[ed] her personal and domestic history." He responded, "I discussed her history with her husband . . . ." He said he had no personal knowledge of whether she had obtained a divorce. He was asked specifically as to whether he ever heard the name of George Leo Welch, the victim, "prior to the prosecution of these proceedings." After he stated that he did not recall hearing the name, he was pressed further and replied:

> Well, its impossible to recall as much as that because you're talking about a period of months and a period of many, many words that are said to me; but I doubt that I ever heard that word, because in examining my file maintained in the office as to Mitzi J. Anderson there has not been any indication of any mention of George Welch. I write down everything.

He had reviewed the file on the morning of the hearing. He said that until the offense occurred he had no knowledge of

---

2. This is an apparent reference to the sixth ground for divorce set forth in Maryland Code (1957, 1973 Repl. Vol., 1979 Cum. Supp.) Art. 16, § 24, which is "when the party complained against has been convicted of a felony . . . under the laws of this State . . . and has been sentenced to serve at least three years . . . in any penitentiary or penal institution 12 months of which sentence has been served . . . ."

the fact that Welch and Lykins "were sharing a residence." The record then is:

Q You did not know it until the offense occurred.

A That's right.

Q You are certain of that?

A To the best of my recall.

Q To the best of your recall?

A That's right.

Q But you cannot say with absolute certainty?

A Mr. Sparling, I can't say with absolute certainty that it's raining outside right now unless I go outside and see the rain; but I can tell you to the best of my recall I never knew that she was living with George Welch anywhere until I learned it the time the police brought me a report of this crime.

Myerberg indicated that he appeared for the State at a bond hearing in the District Court on January 29. He stated that he presented the case to the grand jury. Myerberg was asked whether he made any representation to the District Court at the time of the bond hearing "based upon [his] personal knowledge of Miss Lykins." He responded affirmatively, indicating that this "personal knowledge of her was acquired in [his] meeting her back in July of 1978." The record reflects that at the latter hearing the bond was reduced from $7,500 to $5,000.

On cross-examination Myerberg testified that his representation of Lykins began on July 18, 1978, when he met her at his office and that "other than some telephone communication and some correspondence [he] probably never saw her again." He said, "[W]e terminated as of October the 6th, which is the date on which I believe I forwarded the separation agreement to her for signature by herself and her husband." In response to a question as to when his representation in the matter of an uncontested separation agreement would terminate, he stated:

In matters like this where there was a Judicare

form involved where the client was sent to me as a result of the Maryland Legal Services Program through the Department of Social Services would be over at the time the separation agreement was prepared. That, again, would have been October the 6th.

On re-direct examination Myerberg again was asked whether he knew George Leo Welch, Jr., the victim, prior to the institution of these criminal proceedings. He responded in the negative. He said he did not know whether Welch had ever been in his office, that he might have been, but if he were he "would have been there without telling [Myerberg] his name," which was "why [Myerberg] can't be sure if he was."

Lykins was the only other witness called in support of the motion. She said that at the time of that hearing she was legally married to William R. Anderson, but had been separated from him since May of the preceding year. She testified that she retained Myerberg to represent her in the preparation of a separation agreement. In response to a question as to with whom she was living at the time of the retention of Myerberg, she replied, "I was in the process of living with George Welch," indicating that he was the individual mentioned as the victim in the indictment. She stated that in connection with the case she had visited Myerberg's office accompanied by Welch. The separation agreement was sent to her with instructions to procure the signature of her husband. The record reflects:

Q In fact, once you received the agreement from me, Miss Anderson, you never had any further correspondence or communication with me directly, did you?

A No, because you had mentioned to me once the papers were drawn up and they were sent to me that I'd just go to a notary public.

At another point the record reflects:

Q You never had any contact with me from October on, did you?

A No; but you were still my lawyer as far as I know.

Q As far as you knew; but I had completed the work you assigned me. You assigned me the preparation of the separation agreement, didn't you?

A Yes.

Q You didn't assign me any divorce; you brought me a form for a separation agreement, didn't you?

A Yes.

Q And that was done as of October 6th, wasn't it?

A Right.

She said that she forwarded the agreement on January 6 to Myerberg and requested an acknowledgment of it. This accounts for the letter of January 22, 1979, to Mitzi J. Anderson, previously identified by Myerberg. It was introduced into evidence at the conclusion of the direct examination of Lykins. The letter was from the firm which succeeded to the Myerberg practice upon his election to the full-time position of State's Attorney for St. Mary's County. It "acknowledge[d] receipt of the original Separation Agreement which was returned by [Mrs. Anderson] to th[at] office." She was "advised that [she] m[ight] any time after May 1, 1979, institute a divorce action on the grounds of a voluntary separation in excess of twelve months." [3]

The trial judge quoted from *Sinclair v. State,* 278 Md. 243, 252-56, 259-60, 363 A.2d 468 (1976). Although he said he was "not in any way implying that there is any impropriety in the case or certainly no dishonesty here," he concluded that there was an "appearance of impropriety or interest in the case." Hence, relying upon *Sinclair,* he granted the motion to dismiss, stating:

> How much Mr. Myerberg knew of her personal

---

**3.** The fifth ground for divorce set forth in Code (1957, 1973 Repl. Vol., 1979 Cum. Supp.) Art. 16, § 24 is "when the husband and wife shall have voluntarily lived separate and apart, without any cohabitation, for twelve consecutive months prior to the filing of the bill of complaint, and such separation is beyond any reasonable expectation of reconciliation . . . ."

life at that time the Court is not able to say, and I'm sure he doesn't remember, but the opportunity was there, there's no question about it in the Court's mind. So, the Court, because we must avoid the appearance of conflict of interest in a case, in other words the old saying is avoid the occasion of sin, and the fact that he was in a position to acquire knowledge and the fact that this would certainly put a cloud upon the Defendant's right if she decided to take the witness stand, it would certainly be a deterrent. As I say, I am not deciding there's any impropriety in this case by either party; however, as you well know, we have enough in the newspapers today and otherwise to subject our profession to censure, which is being done.

The Court of Special Appeals distinguished *Sinclair,* saying the trial judge's reliance on it was "totally misplaced"; pointed out, "Notwithstanding a strong appearance of true bias, the Court of Appeals in *Sinclair* remanded the case to the trial court to determine whether an actual conflict of interest existed or not"; said, "There is no shred of a suggestion that Mr. Myerberg had 'any pecuniary interest or a significant personal interest in a civil matter' which would impair his ability to act impartially in the criminal prosecution"; reversed the judgment, and held that neither Myerberg nor his assistant could "be disqualified from performing their prosecutorial duties in this case." *Id.* 43 Md. App. at 474-75.

The litigant in *Sinclair* was prosecuted for five alleged violations of the Worthless Check Act, then Maryland Code (1957, 1976 Repl. Vol.) Art. 27, § 142. He moved to dismiss the information filed against him claiming that the State's attorney and his deputy were partners in the practice of law; that they had acted as attorneys for an individual and a bank holding notes against entities and individuals from whom Sinclair had purchased the business he was then operating; that they had attempted to sell the notes to Sinclair; that the sale of the notes was not consummated after which presentment was made to the grand jury and

informations were issued which were the subject of the then pending criminal actions; that prior to the presentment to the grand jury the State's attorney informed Sinclair that if he filed an appeal in a civil action involving one of the entities represented by the State's attorney that the latter would indict Sinclair; that the appeal was taken; that the grand jury was called into special session on the day following the appeal and indictments were returned; and that prior to the filing of the appeal "the Grand Jury had been given presentments but had not returned any indictments." The motion to dismiss was denied by the trial court without a hearing. Then, after the prosecution had presented its case, the defense attempted without success to call the State's attorney as a witness. A proffer then was made which included that the State's attorney told Sinclair that if he would pay some of the bills the State's attorney was attempting to collect from him, then most of the charges against Sinclair would be dropped.

In *Sinclair* Judge Digges discussed for the Court a number of cases concerning conflicts of interest, including conflicts on the part of a prosecutor. The Court said:

> These decisions seem to suggest what we think is the controlling principle of this case: if a prosecutor has, or would clearly appear to a reasonable person having knowledge of the pertinent facts to have, any pecuniary interest or a significant personal interest in a civil matter which may impair his obligation in a criminal matter to act impartially toward both the State and the accused, then he is, on the basis of this State's public policy, disqualified from initiating or participating in the prosecution of that criminal cause. The corollary to this principle is that if a prosecutor who should have been disqualified is involved in his official capacity in the bringing of charges (by way of indictment or information) against the defendant, then upon timely objection the charges will be dismissed, or if such a prosecutor participates in his official capacity in the prosecution of the case, then upon

timely objection any resulting conviction will be reversed and a new trial ordered. [*Id.* 278 Md. at 254-55 (footnotes omitted).]

\* \* \*

[W]e think it relevant that § 1.2 (a) of The A.B.A. Project on Standards For Criminal Justice, Standards Relating To The Prosecution Function (Approved Draft, 1971) cogently declares that "A prosecutor should avoid the appearance or reality of a conflict of interest with·respect to his official duties." The commentary to that section adds that "It is of the utmost importance that the prosecutor avoid participation in a case in circumstances where any implication of partiality may cast a shadow over the integrity of his office." In sum, there is ample support, of several varieties, for the principle of law we have announced in this opinion.

Having determined what the standard is, we again turn to the record which is before us at this time. Upon examination, we find a record which bristles with unresolved nonfrivolous allegations of specific prosecutorial conflicts of interest. Although these allegations, as made, should compel inquiry, and such investigation is all the more required since the state's attorney at one time attempted to disqualify himself from participating in the prosecution, the trial judge did not factually determine, *see Beshore v. Town of Bel Air,* 237 Md. 398, 408, 206 A.2d 678 (1965), *quoting Montgomery County v. Walker,* 228 Md. 574, 580, 180 A.2d 865 (1962), whether there were such conflicts. Because the validity of the petitioner's conviction, including the information filed against him, turns on this question of fact, which must be resolved by the trial judge and not by this Court, we will remand this case to the Circuit Court for Caroline County for further proceedings. [*Id.* 278 Md. at 259-60 (footnotes omitted).]

*See* Annot., 31 A.L.R.3d 953 (1970).

It will be seen that *Sinclair* does not stand for the proposition that a mere appearance of impropriety on the part of a prosecutor is ground for dismissing an indictment. There was an obvious appearance of impropriety in *Sinclair*. Hence, if the mere appearance of impropriety had been a sufficient ground for dismissal, we would have dismissed the information and would not have remanded the case to the circuit court for further proceedings. The allegation in *Sinclair* was that the defendant was being prosecuted out of improper motives, that the State's attorney was using the lever of prosecution to promote the interest of clients represented by him in civil matters. This it was alleged deprived Sinclair of the proper exercise of the discretion of the State's attorney as to whether the prosecution should be instituted.[4] That discretion was described by Judge Singley for the Court in *Murphy v. Yates,* 276 Md. 475, 495, 348 A.2d 837 (1975), as "most awesome discretionary power: to determine whether or not to prosecute." *See generally* Civiletti, *The Prosecutor As Advocate,* 25 N.Y.L.S.L. Rev. 1 (1979), and Thorne, *The Rural Prosecutor and the Exercise of Discretion,* 12 Crim. L. Bull. 301 (1976).

This case is factually distinguishable from *Sinclair* because it is not contended that the prosecution has been instituted for improper reasons. Lykins claims that because of the State's attorney's prior representation of her there is an appearance of impropriety and that a possibility exists that in some way in the prosecution he might inadvertently use information previously confided to him by her in their attorney-client relationship. This, she says, not only should bar participation in the prosecution by her former attorney, but requires dismissal of her indictment. It is a little difficult to comprehend how either of these facts could affect the validity of the indictment. Lykins' statement to the police with but little more would have been ample basis for the

---

4. The record discloses that on the remand in *Sinclair* an evidentiary hearing was held before a different judge. No ruling was ever made on the allegations of Sinclair because, after considerable testimony had been offered, Sinclair elected to tender a plea of nolo contendere. This was accepted, over objection from the State, by the trial judge who had been specially assigned from another circuit to hear the cause. A special prosecutor had been appointed to represent the State.

return of an indictment. In *Bartram v. State,* 280 Md. 616, 630, 374 A.2d 1144 (1977), we pointed out that in *Everhart v. State,* 274 Md. 459, 487-88, 337 A.2d 100 (1975), Judge O'Donnell observed for the Court that "even the submission unto the grand jury of evidence obtained in violation of [a defendant's] constitutional rights would not impair the validity of his indictment . . . ." It thus would seem to follow that even if in some fashion the State's attorney did apprise the grand jury of something gleaned from his confidential relationship with Lykins, this would not void the indictment. In *Bartram* we reviewed a number of our prior cases relative to the function and powers of grand juries, referring, among other things, to their plenary inquisitorial powers and the well settled law that the competency of testimony before a grand jury will not be inquired into by the courts. *Id.* 280 Md. at 621-28.

Lykins seems to have the idea that if at a time subsequent to the grand jury's return of the indictment in this case it were determined that the State's attorney who presented the matter to the grand jury should be disqualified or recused, then the fact that such person had been in the grand jury room in connection with the obtention of the indictment would impair the validity of the indictment. Myerberg is the duly constituted State's Attorney for St. Mary's County. As such, he is the legal advisor to the grand jury. Consequently, it would be proper for him to be in the grand jury room other than when its members are deliberating on whether or not to return an indictment. *Coblentz v. State,* 164 Md. 558, 166 A. 45 (1933), is not apposite. Reversal in *Coblentz* came because of the presence in the grand jury room of an unauthorized person, an attorney who represented certain plaintiffs in civil litigation against the banking institution of which the defendant was president. The president was accused of accepting a deposit when the institution was, to his knowledge, insolvent. There had been an attempt under then Code (1924) Art. 10, § 27 to designate this attorney as an assistant prosecutor for the State, but the Court held that as that statute then existed such an appointment for that proceeding was not authorized. Hence, the presence of that

individual in the grand jury room was improper. As we pointed out in *Bartram,* 280 Md. at 626-27, it goes without saying that the presence of an unauthorized person in the grand jury room could betray the secrecy of the proceeding. In the posture of this case *Coblentz* is instructive because:

> A second objection advanced in the plea was that nine members of the grand jury were disqualified from serving in the investigation and from finding this particular indictment because they had been subject to losses as depositors in the Central Trust Company, or in other depositaries which had been merged with that company, and were embittered against the defendant; and because the foreman, one of those depositors, had publicly declared his hostility to the defendant and charged him with fraud. [*Id.* 164 Md. at 570.]

Chief Judge Bond said for the Court:

> This objection we find insufficient to support the plea. The grand jury, as has been observed, is not a judicial body; it is an accusing body, permitted to act upon knowledge obtained by its members from any source. Under the requirements of the statute law of the state, Code, art. 51, secs. 7 to 10, they are chosen with judgment and discretion with reference to their intelligence, sobriety, and integrity; and they are sworn to present no person for envy, hatred, malice, or ill will. But there are no statutory provisions in Maryland, as there are in some other states, prescribing additional cautions or qualifications, and we find no ground for imposing a requirement that they must be unprejudiced, as the objection demands. On the contrary, such a requirement would seem inconsistent with their freedom to accuse upon their own knowledge, for persons who come with knowledge sufficient to serve as a basis of indictment are likely to come with the conclusion and prejudice to which that knowledge leads. They must act upon their own

convictions, after conferring secretly and without any interference; but they are not required to come without any prejudice. It has sometimes been held that a direct pecuniary interest in a prosecution might serve to disqualify a grand juror, but there is seldom such a direct private interest involved in criminal prosecution; and none is involved here. In *State v. Brainerd,* 56 Vt. 532, it was objected that members of a grand jury which found an indictment on a charge of embezzlement from a trust company were disqualified because some of them were directly or through members of their families interested as depositors in the company, but the court, page 537 of 56 Vt., held that such jurors could not be said to be interested in the event of the prosecution, because they could neither gain nor lose by a conviction or acquittal of the accused. Possibly cases may be met with in which grand jurors would have such interest as would render them incompetent, but the mere prejudice that might result from the losses outlined in the present plea seems insufficient. This, we believe, is in accordance with the weight of authority elsewhere. [*Id.* at 570-71 (citing cases).]

The "pecuniary interest or . . . significant personal interest" mentioned in *Sinclair* as requiring dismissal of the charging document is more than a mere appearance of impropriety such as in this case. Unlike the situation in *Sinclair,* there is not the slightest suggestion here that the prosecution was brought out of improper motives. The trial judge said, "I am not deciding there is any impropriety in this case by either party . . . ." It is apparent, however, that in the exercise of his discretion he determined that another prosecutor should be appointed because of the appearance of impropriety, that to permit appearance on behalf of the State of former private counsel for an accused was not in accord with the sound administration of justice. We cannot say that he abused his discretion in this regard, although in the circumstances alleged here we disagree with his

conclusion that dismissal of the indictment was authorized. Hence, we disagree with the outright reversal by the Court of Special Appeals.

We find support for our view in the analogous situation before the Court in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), in the context of a claim that counsel in a criminal case had improperly represented more than one defendant. Mr. Justice Powell there said for the Court:

> The Court of Appeals granted Sullivan relief because he had shown that the multiple representation in this case involved a possible conflict of interest. We hold that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance. [Id. at 100 S. Ct. 1719.]

We hold that the proper action to be taken by a trial judge, when he encounters circumstances similar to those in the case at bar which he determines to be so grave as to adversely affect the administration of justice but which in no way suggest the bringing of a prosecution for improper motives (as was the case in *Sinclair*), is to supplant the prosecutor, not to bar the prosecution. Of course, a trial judge may determine that the facts presented to him are not sufficiently grave to require even this action. Normally, the evaluation of such circumstances is left to the sound discretion of the trial judge who is upon the scene and able to sense the nuances of that before him. Ordinarily an appellate court will not interfere with his conclusion as to the proper course of action to be followed in the absence of a showing of an abuse of discretion upon the part of the trial judge.

A special prosecutor appointed in a case such as this will be vested with the right either to proceed with the

prosecution or to drop the charges in accordance with his "most awesome discretionary power: to determine whether or not to prosecute" mentioned by Judge Singley for the Court in *Murphy,* 276 Md. at 495.[5] The appointment of a special prosecutor may be accomplished in one of three ways. (1) The trial court may invoke the powers vested in it under Code (1974, 1980 Repl. Vol.) § 2-102 (a) Courts and Judicial Proceedings Article and designate some attorney as assistant counsel for the State. (2) As was done in *State v. Ensor and Compton,* 277 Md. 529, 356 A.2d 259 (1976), the Attorney General may be requested to designate one of his assistants to be appointed by the trial court as assistant counsel for the State. (3) The State's attorney may request the Governor to require the Attorney General under Constitution Article V, § 3 to aid the State's attorney in prosecuting the action.

> *Judgment of the Court of Special Appeals modified and as modified affirmed; case remanded to that court for passage of an order reversing the judgment of the Circuit Court for St. Mary's County and further remand to that court for further proceedings consistent with this opinion; appellant to pay the costs.*

---

5. In Biller v. Director, 22 Md. App. 375, 322 A.2d 899 (1974), the Court of Special Appeals quoted an address by the Honorable Simon E. Sobeloff, then Solicitor General of the United States, a former Chief Judge of this Court, to the Judicial Conference of the Fourth Circuit, June 29, 1954, where he said:

> The Solicitor General is not a neutral, he is an advocate for a client whose business is not merely to prevail in the instant case. My client's chief business is not to achieve victory but to establish justice. We are constantly reminded of the now classic words penned by one of my illustrious predecessors, Frederick William Lehmann, that the Government wins its point when justice is done in its courts. [*Id.* at 377.]

For similar views, see Brack v. Wells, 184 Md. 86, 90, 40 A.2d 319 (1944), quoted for the Court by Judge Digges in Sinclair v. State, 278 Md. 243, 252, 363 A.2d 468 (1976), and Wells v. Price, 183 Md. 443, 449, 37 A.2d 888 (1944).

*Davidson, J., concurring in part and dissenting in part:*

I agree with the majority that the trial court did not abuse its discretion when it determined that a State's attorney should be disqualified from participating in a trial because of "an appearance of impropriety." To this extent, I concur. I do not agree with the majority, however, that the trial court abused its discretion when it determined, in the absence of findings of an actual impropriety or an improper motive for initiating the criminal prosecution, that the indictment should be dismissed. Accordingly, I dissent.

In *Sinclair v. State,* 278 Md. 243, 244, 363 A.2d 468, 469-70 (1976), this Court considered the question whether Maryland's public policy requires a criminal charge to be dismissed if a State's attorney initiates or participates in a prosecution "when he has a conflicting private interest in a civil matter." There, we enunciated the controlling principle that:

> "[*I*]*f a prosecutor* has, or *would clearly appear* to a reasonable person having knowledge of the pertinent facts *to have,* any pecuniary interest or *a significant personal interest in a civil matter which may impair his obligation in a criminal matter to act impartially* toward both the State and the accused, then *he is,* on the basis of this State's public policy, *disqualified from initiating* or participating in *the prosecution of that criminal cause.* The corollary to this principle is that *if a prosecutor who should have been disqualified is involved* in his official capacity *in the bringing of charges (by way of indictment* or information) against the defendant, then upon timely objection *the charges will be dismissed,* or if such a prosecutor participates in his official capacity in the prosecution of the case, then upon timely objection any resulting conviction will be reversed and a new trial ordered." [*Sinclair,* 278 Md. at 254-55, 363 A.2d at 475 (footnotes omitted) (emphasis added).]

Clearly encompassed in this principle is the following principle:

> "[I]f a prosecutor . . . would clearly appear . . . to have . . . a significant personal interest in a civil matter which may impair his obligation in a criminal matter to act impartially . . . he is . . . disqualified from initiating . . . the prosecution of that criminal cause. . . . [I]f a prosecutor who should have been disqualified is involved . . . in the bringing of charges (by way of indictment . . .) the charges will be dismissed. . . ." [*Sinclair,* 278 Md. at 254-55, 363 A.2d at 475.]

In adopting this principle, we recognized that the impartial exercise of the prosecutor's functions is essential to the fair and equal administration of justice. We quoted from *State v. Tate,* 185 La. 1006, 1019-20, 171 So. 108, 112 (1936), as follows:

> " '*In conducting a criminal case the prosecuting attorney must be fair and impartial,* and see that defendant is not deprived of any constitutional or statutory right, because he is a quasi judicial officer.
>
> . . .
>
> *He represents the State, and the State demands no victims.* It seeks justice only, equal and impartial justice, and it is as much the duty of the district attorney to see that no innocent man suffers as it is to see that no guilty man escapes. Therefore he should not be involved or interested in any extrinsic matters which might, *consciously or unconsciously,* impair or destroy his power to conduct the accused's trial fairly and impartially.' " [*Sinclair,* 278 Md. at 256-57, 363 A.2d at 476 (emphasis added).]

More particularly, we recognized that both the seeking of an indictment and the filing of an information require a prosecutor to decide whether to bring charges and therefore constitute an exercise of "the State's Attorney's most

awesome discretionary power." *Murphy v. Yates,* 276 Md. 475, 495, 348 A.2d 837, 848 (1975). In concluding that a prosecutor is unable to exercise this discretionary power impartially if he has a conflict of interest, we quoted from In re *Ridgely,* 48 Del. 464, 471-72, 106 A.2d 527, 531 (1954), as follows:

> " 'Now, the exercise of [discretionary] power by the prosecuting officer — *the decision to prosecute or not to prosecute . . .* — involves the performance of one of the most difficult and delicate functions of his office. It requires the weighing and balancing of *interests that may, and often do, conflict — those of the public and those of the victim. . . .* One thing is certain. The prosecuting officer cannot perform this function — he cannot discharge his public obligation — if his personal interests are involved. And *his representation of the [victim] at once gives him a personal interest in the matter that disables him from the proper performance of his official duty.' " [Sinclair,* 278 Md. at 257-58, 363 A.2d at 477 (emphasis added).]

In addition, we recognized that because the impartial exercise of the prosecutor's discretion is essential to the fair and equal administration of justice, a prosecutor must not only be impartial in the exercise of his duty, but also must appear to be so. We quoted from The American Bar Association Project On Standards For Criminal Justice, Standards Relating To The Prosecution Function, § 1.2(a) and its Commentary, (Approved Draft, 1971), as follows:

> " 'A prosecutor should avoid *the appearance* or reality *of a conflict of interest* with respect to his official duties.' . . . 'It is of the utmost importance that the prosecutor avoid participation in a case in circumstances where *any implication of partiality* may cast a shadow over the integrity of his office.' " [Sinclair,* 278 Md. at 259, 363 A.2d at 478 (emphasis added).]

We further recognized that a prosecutor's motive for participating in a case in which he has an apparent conflict of interest is irrelevant. We quoted from *Derlin v. Derlin,* 142 Md. 352, 364, 121 A. 27, 31 (1923), which itself quoted with approval language from 2 R.C.L. 974 ¶ 51:

> " 'An attorney at law who has once been retained and received the confidence of a client, is thereafter disqualified from acting for any other person adversely interested in the same general matter, however slight such adverse interest may be. *Nor does it matter that the intention and motive of the attorney are honest.* This rule is a rigid one, and designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent.' " [*Sinclair,* 278 Md. at 253-54, 363 A.2d at 474-75 (emphasis added).]

Moreover, we recognized that even in the absence of an actual impropriety or an improper motive, an indictment must be dismissed if the prosecutor has an apparent conflict of interest arising out of a significant personal interest in a related civil matter. We further recognized that a prosecutor has a significant personal interest in not violating a confidential relationship established during his prior representation of a criminal defendant in a related civil matter. We relied on *State v. Detroit Motors,* 62 N.J. Super. 386, 163 A.2d 227 (1960), a case in which the apparent conflict of interest arose out of the prior representation of the criminal defendant in a related civil matter. There the indictment issued at a time when the prosecutor was a member of a law firm in which another member was representing the accused in a related civil matter. The trial court found that in seeking the indictment, the prosecutor

did not have any improper intent or motive and had not engaged in any improper conduct.[1] It concluded that public policy dictated that criminal prosecutions must be free of any imputation of improper influence or motive, and that it was necessary to avoid the prejudicial atmosphere inherent in the circumstances affecting the indictments. Accordingly, the indictments were dismissed. We quoted from *Detroit Motors* as follows:

> " 'The principle long ago was recognized that no man can adequately or properly serve two masters, and this is the chief subject of Canon 6 [(now Canon 5)] of the Canons of Professional Ethics. It is inconsistent with the public interest and welfare for any law enforcement officer directly or indirectly to represent any person involved in a criminal matter, except the State.... The books are replete with cases indicating that any appearance of evil in connection with the administration of public office should and must be avoided; and particularly is this true of those offices involved in the enforcement of the law.
>
> * * *
>
> " '*To permit a prosecuting attorney to have an interest of any nature whatsoever in any civil proceedings, directly or indirectly,* and which proceedings involve similar facts or the same subject matter as a criminal prosecution then pending or thereafter initiated, *can only give rise to suspicion* concerning and relating to the motives of the prosecuting attorney involved, and bring such

---

1. With respect to improper intent or motive, the Superior Court of New Jersey said:

"The above rules [prohibiting attorneys from prosecuting former clients] appear to be inviolate *regardless of intent or motive.* This is apparently so because in any given case, except a very unusual one, it would not be possible for the defendant to prove any such breach of confidence or resulting prejudice. The circumstances by their very nature give rise to *possibilities and inferences which should be avoided in the enforcement of the law.*" [Detroit Motors, 62 N.J. Super. at 394, 163 A.2d at 231 (emphasis added).]

office into disrepute with the public.' " [*Sinclair,* 278 Md. at 255-56, 363 A.2d at 476 (emphasis added).]

I am persuaded that the controlling principle enunciated in *Sinclair,* when read in the context of the authorities and concepts relied upon, requires that an indictment be dismissed if a prosecutor's ability to act impartially may be impaired by an apparent conflict of interest arising out of his prior representation of a criminal defendant in a related civil matter. I am not persuaded that that controlling principle is limited to cases in which there is an actual impropriety or an improper motive. In my view, the majority has radically departed from the controlling principle in *Sinclair.* In the absence of any expressed rationale, I decline to join in this departure. I believe now, as I believed then, *see Sinclair v. State,* 27 Md. App. 207, 340 A.2d 359 (1975) (Davidson, J., dissenting), that that principle is sound. I am still convinced that a prosecutor who exercises his discretion in a manner contrary to applicable ethical standards creates a fatal defect in the accusatory phase of the criminal prosecution. I adhere to my previously expressed view that:

"Continuation of the American concept that we are to be governed by the rules of law requires that the people have faith that justice can be obtained through our legal system. That faith is justified and can exist only when the people are convinced that justice is administered evenhandedly. The exercise of a State's Attorney's broad prerogative to determine whom, what and how to prosecute must adhere rigidly to the standards of conduct established by law. Any act not in accordance with those standards, because it impairs the confidence of the people in the integrity of the exercise of the State's sovereign power to indict and prosecute, tends to destroy the people's faith in the fair and equal administration of justice. Such acts are not to be sanctioned or condoned by the courts." [*Sinclair,* 27 Md. App. at 230-31, 340 A.2d at 373 (Davidson, J., dissenting) (footnote omitted) (citation omitted).]

Here the record shows that the State's attorney exercised his prosecutorial discretion when he decided to go before the grand jury to seek an indictment against an individual whom he had formerly represented with respect to a legal separation. There was evidence to indicate that at the time the separation agreement was drafted, the former client was living with the man she was later accused of assaulting, and that he had in fact accompanied her to her attorney's office. Manifestly, the State's attorney was in a position to have obtained confidential information related to the criminal prosecution. Such information could have influenced him in deciding what to investigate, whether to seek an indictment, and what evidence to present to the grand jury. These circumstances are sufficient to create an apparent conflict of interest between the prosecutor's duty to his former client and his duty to the public.[2] Thus, these circumstances are

---

2. Md. Rule 1230, and Appendix F, ABA Code of Professional Responsibility, Canon 4, provides:

"A lawyer should preserve the confidences and secrets of a client."

EC 4-1 provides in pertinent part:

"Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the *preservation by the lawyer of confidences and secrets* of one who has employed or sought to employ him. *A client must feel free to discuss whatever he wishes with his lawyer....*" (Emphasis added.)

EC 4-5 provides in pertinent part:

"A lawyer *should not use information acquired in the course of the representation* of a client to the disadvantage of the client...." (Emphasis added.)

EC 4-6 provides in pertinent part:

"The obligation of a lawyer to preserve the confidences and secrets of his client *continues after the termination of his employment....*" (Emphasis added.)

Canon 9 provides:

"A lawyer should avoid even the appearance of professional impropriety."

EC 9-6 provides in pertinent part:

"Every lawyer owes a solemn duty to ... *strive to avoid* not only professional impropriety but also *the appearance of impropriety.*" (Emphasis added.)

The ABA Project on Standards for Criminal Justice, Standards Relating to

sufficient to support the trial court's finding that there was an appearance of impropriety on the part of the prosecutor arising out of his previous representation of his former client in a related civil matter. Because of the apparent conflict of interest, the prosecutor's ability to act impartially toward both the State and the accused in the criminal matter may well have been impaired. On the basis of this State's public policy, the prosecutor should have been disqualified from initiating this prosecution, and the charges which he brought by way of indictment should have been dismissed. Finally, a special prosecutor should have been appointed to determine, on a fair and impartial basis, whether the public interest required either that a new criminal prosecution be instituted, or that the prosecutor's former client be discharged. Only by so doing can public confidence be maintained in the impartial exercise of the State's sovereign power to indict and prosecute, and, therefore, in the fair and equal administration of justice.

A trial court, like all courts, has the responsibility of safeguarding both the rights of the accused and the interests of the public in the administration of justice. It has the obligation to remedy actual or apparent improprieties which undermine public trust in the legal system. *See People v. Krstovich,* 72 Misc. 2d 90, 338 N.Y.S.2d 132, 137-38 (1972); *Ward v. State,* 33 Okla. Crim. 182, 184, 242 P. 575, 576 (1926). Under the present circumstances, the trial court did not abuse its discretion in dismissing the indictment. Accordingly, I would reverse the judgment of the Court of Special Appeals.

Judge Cole authorizes me to state that he joins me in the views expressed herein.

---

the Prosecution Function and the Defense Function, (Approved Draft 1971, Supp.) § 1.2, provides in pertinent part:

"A prosecutor should *avoid the appearance* or reality *of a conflict of interest* with respect to his official duties." (Emphasis added.)

The commentary to § 1.2 provides in pertinent part:

"*A conflict of interest may arise when,* for example . . . *a former client* or associate *is a defendant in a criminal case.* . . . It is of the utmost importance that the prosecutor avoid participation in a case in circumstances where *any implication of partiality may cast a shadow over the integrity of his office.*" (Emphasis added.)