845 A.2d 71

**Elsa NEWMAN**

v.

**STATE of Maryland.**

**No. 3002, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Dec. 11, 2003.

Reconsideration Denied March 8, 2004.

22

Barry H. Helfand, David A. Martella, Rockville, for appellant.

Edward J. Kelley (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Argued before DAVIS, ADKINS and GREENE, JJ.

GREENE, J.

Appellant, Elsa Newman, was convicted in a jury trial before the Circuit Court for Montgomery County, (Rupp, J., presiding) of conspiracy to commit murder in the first degree, attempted murder in the first degree, first degree assault, first degree burglary, and use of a handgun in the commission of a felony or crime of violence. She was sentenced to a total of twenty years incarceration. Appellant filed a timely appeal in this Court alleging a panoply of errors.

Perceiving no reversible error, we affirm the conviction.

**Issues**

Appellant presents eight questions of varying degrees of validity for our review:

1. Did the trial court err in denying appellant's motion to order the disqualification of the Montgomery County State's Attorney's Office for violations of the attorney-client privilege?

2. Did the trial court err in allowing appellant's domestic relations attorney to testify about confidential attorney-client communications?

3. Did the trial court err in denying appellant's requested *voir dire* concerning the potential bias of members of the jury panel?

4. Did the trial court err in denying appellant's motion for a mistrial upon the State's eliciting testimony about appellant's exercise of her constitutional rights to counsel?

5. Did the court err in allowing the State to introduce evidence in its case in chief?

 A. Characterizations of Ms. Newman and her relationship with Ms. Landry.

 B. Evidence of an unrelated fraud allegedly committed by appellant and Ms. Landry.

 C. Testimony about the credibility of child abuse allegations against appellant's ex-husband and in limiting appellant's ability to cross-examine that opinion.

 D. Testimony about the conveyance of funds between Ms. Newman and Ms. Landry during the divorce proceedings.

6. Did the trial court err in denying appellant's requested instructions regarding the law of self-defense?

7. Was the evidence sufficient to convict appellant of any count?

8. Did the trial court err in denying appellant's motion for a new trial

## FACTS AND PROCEEDINGS

After a six-day jury trial, appellant was found guilty of a number of charges arising from the attack on appellant's ex-husband, Arlen Slobodow, by her best friend, Margery Landry.[1] During the trial, the State proved to the jury's satisfaction that appellant and Landry conspired to kill Slobodow because they believed he was sexually abusing the couple's two sons, Lars and Herbie.

The State's theory of the case was that appellant and Landry had grown increasingly desperate to protect the two boys from Slobodow after their numerous complaints of child abuse were closed "unfounded." In their desperation, appellant and Landry conspired to have Landry break into Slobodow's house and kill him while appellant was in New Jersey at a family wedding. The plan also included planting child pornography in Slobodow's house to "prove" that the allegations of child abuse were correct, thereby vindicating appellant and returning custody of the children to her.

The State offered testimony of appellant's former domestic relations attorney, Steven Friedman, that appellant and Landry had conspired to kill Slobodow, as well as to kill one of the children in his presence in an effort to "save" the other. They also offered the testimony of Friedman's former secretary, Sandra Ashley, who said that, while at dinner together, appellant told her that Landry had connections to organized crime and could obtain an untraceable gun. She also told Ashley that she wanted to kill Slobodow.

Appellant took the stand in her own defense and denied the conspiracy. She argued that the evidence establishing her motive, the bitter custody dispute, was also evidence of why appellant would know that she would be a prime suspect and, therefore, likely have her children taken from her. Furthermore, the threats attributed to her were made during a

---

1. Landry pled guilty to assault, burglary, reckless endangerment, use of a handgun in the commission of a felony, and obliterating the serial number on a gun. She was sentenced to 50 years suspend all but 20 on December 17, 2002.

divorce/custody battle, and taken in context, were emotional outbursts not uncommon to the situation. Lastly, she contended that Landry had her own reasons for wanting to kill Slobodow because of her close relationship as Godmother to the boys.

With these theories in mind, we turn to the facts of the evening in question. On January 6, 2002, Arlen Slobodow was asleep in his bed with his five-year old son Lars, when he was pulled from his bed by an assailant wearing all black and a mask. He immediately heard two gunshots and felt a pain in his right leg. One of the bullets went through Mr. Slobodow's right leg above the knee. A struggle ensued in which Slobodow pulled the mask off of the assailant and discovered Margery Landry.

Slobodow knocked the gun out of Landry's hands and attempted to call the police. Landry grabbed the phone and hit Slobodow about the head and face with the receiver. Slobodow yelled for his sons to call the police. Landry instructed the children to return to their beds. She then left the bedroom.

After Landry left the bedroom, Slobodow dragged himself to the kitchen to try and call the police. While in the kitchen, Landry again attacked him. He was able to bite her hand and she fled. The police responded at 4:31 a.m. and found Slobodow in the dining room with his two sons.

Investigation at the house revealed a broken basement window believed to be the entry location. Blood was found on the windowsill and on leaves just outside of the window. A trail of blood was found leading down the stairs to the kitchen, to the basement, and out the open window. In the basement, the police found a fanny pack containing a box of .9 MM ammunition, a pornographic video tape, books, and magazines. Landry's finger prints were found on the books and ammunition.

In the bedroom, police found signs of a struggle. There was blood on the floor of the room and a potted plant had been overturned. The police found a Smith & Wesson .9 MM

handgun with the serial number scratched out in the room with an empty magazine and two shell casings. Above the bed were two bullet holes. A black knit mask with a pair of eyeglasses inside and a torn latex glove were also found in the room.

Additional facts will be provided throughout the discussion section.

## DISCUSSION

### I. Disqualification of the Montgomery County State's Attorney's Office

Appellant's first ground for appeal is that the trial court erred by not disqualifying the entire Montgomery County State's Attorney's office for violations of the attorney-client privilege during the discovery process. The violations allegedly occurred during the screening of information removed from appellant's home pursuant to search warrants issued after the shooting of Mr. Slobodow.[2]

Appellant argues that the privileged documents taken from her home were "inappropriately inspected" by prosecutors in the State's Attorney's office and that "[t]heir access to the documents gave them insight into this case that they otherwise might not have had." In short, appellant's argument is that the State relied on the contentious divorce and custody battle between appellant and the victim to show motive for the attempted murder, the State's access to the privileged documents allowed them greater insight into the proceedings, and the proper remedy for the violation is disqualification of the entire Montgomery County State's Attorney's office. For the following reasons we do not agree.

At the beginning of the June 14, 2002, hearing on the Motion to Disqualify, the trial court properly evaluated the

---

2. Specific items removed were documents, appellant's computer, and information obtained from the hard drive of appellant's computer that related to appellant's divorce and custody battle with Mr. Slobodow.

issue. The court said that the State relied on the divorce and custody issues in their case in chief:

> [A]ccordingly, unless counsel disagrees, it appears to me that there is a substantial relationship which exists between the subject matter of the privileged communications which were seized pursuant to the search warrant and the prosecution of [appellant] which would make it incumbent upon the State to have established a screening device to preclude the prosecutors in this case from having access or using the information which is privileged communication between Ms. Newman and her attorney or attorneys in the divorce and custody proceedings.

The trial court then heard evidence to determine the adequacy of the screening process.[3]

Former Assistant State's Attorney Thomas Eldridge testified that a screening system was established by the State's Attorney's office in which "thousands" of documents were separated into three categories: "clearly privileged," "could be privileged," and "clearly not privileged."[4] Deputy State's Attorney Katherine Winfree, the lead prosecutor in the case, instructed Mr. Eldridge to review the documents in accordance with the above screening procedure.

Mr. Eldrige reviewed the documents for two days at the Bethesda police district before they were moved to a locked room at the State's Attorney's office. When asked to characterize his ability to identify "privileged," "potentially privileged," and "not privileged," documents, Mr. Eldridge testified that:

---

3. At the close of the hearing the trial court asked the parties to brief the following questions: (1) whether the screening process effectively protected the privilege; (2) if it did not, what is the remedy; and (3) whose burden is it to establish that a privilege existed. Both parties submitted briefs and no additional testimony was offered at the second hearing held on June 28, 2002.

4. As discussed later in the opinion, the "clearly privileged" and "could be privileged" categories were eventually combined into a "privileged" category.

Well, I found it was, it was easy to see the things that were clearly privileged and so, I found it fairly easy when they were clearly communications to put those into that category. I found it more difficult because I believe Ms. Newman's a lawyer and because many of the things that she did with her written material weren't necessarily clearly directed at her lawyer, those were the ones that were a little harder to categorize, and I tried to err on the side of considering those potentially privileged because, for all I knew, they did, in fact, get sent to one of her lawyers. So, I tried to be conservative, to answer your question.

Mr. Eldridge left the State's Attorney's office during his review of the documents. He was replaced by Assistant State's Attorney Eric Nee of the Economic Crimes Unit of the Silver Spring team. Mr. Nee testified that, in preparation for taking over for Mr. Eldridge, he researched the attorney-client privilege and discussed the procedure with Eldridge.

The majority of the documents were reviewed over a two-week period by Mr. Nee. Nee testified that "I got to the point where I thought if it was possibly privileged just out of—I just, if it was possibly privileged, I'd just put it in the privileged pile." He further testified that with regard to the final report of appellant's computer hard drive, he redacted and shredded the privileged material that could be separated from non-privileged information, and blacked-out the privileged information that could not be separated.[5] The blacked-out original was then photocopied so no one could read what was under the blacked-out sections and the original was shredded.

The documents deemed "privileged" were returned to the defense and had not been seen by either the State's attorneys prosecuting the case or the investigators investigating the case. Those documents deemed "not privileged" were turned

---

**5.** The final report of the hard drive prints out as a running document. Consequently, there could be a series of different documents on one page, some privileged and some not privileged.

over to the prosecution and investigation teams and eventually, through discovery, the defense team.

On appeal, appellant relies on two documents in particular that she claims were privileged and yet disclosed to the prosecution. The first is a document taken from appellant's hard drive that is, to use appellant's words in the actual document, a "rough list" of events that took place between appellant and Steve Friedman,[6] addressed to an unknown recipient. The second is a series of e-mails back and forth between appellant and Robert E. Juceam, an attorney and friend of appellant's, discussing a letter appellant was intending to send to the State Department regarding disclosures made by State Department employees to a Montgomery County court appointed attorney for her children in the divorce case.

Because there is no case specifically on point, we analogize to similar situations where an agent of the State gains access to information falling within the attorney-client privilege, thereby causing the appearance of impropriety.

We find *Young v. State,* 297 Md. 286, 465 A.2d 1149 (1983)(Davidson, J. dissenting), and the cases discussed therein, instructive. In *Young,* the Court of Appeals was asked to decide if an entire prosecutor's office should be disqualified when the Assistant Public Defender that was assigned to Young's case was appointed to the State's Attorney's office before the case came to trial. Young argued for a *per se* disqualification rule. The Court reviewed case law from neighboring states that had addressed the issue. Although some states had adopted a *per se* disqualification rule based on the appearance of impropriety, others had chosen to allow the trial court to determine if any actual impropriety was to be found. *Id.* at 290–295, 465 A.2d 1149. The Court of Appeals in *Young* concluded that a *per se* rule was not necessary:

> [T]he mere appearance of impropriety is not of itself sufficient to warrant disqualification of an entire State's Attor-

---

6. Mr. Friedman is appellant's former attorney in the divorce and custody dispute.

ney's office, based upon one member's prior representation of a defendant presently under prosecution. Where disqualification is sought, the trial court must make inquiry as to whether the defendant's former counsel participated in the prosecution of the case or divulged any confidential information to other prosecutors. Absent an abuse of discretion, the trial court's judgment on the matter will not be disturbed on appeal.

The *Young* Court relied heavily on the case of *Lykins v. State*, 288 Md. 71, 415 A.2d 1113 (1980), in formulating its position. *Lykins* also addressed the ramifications of the appearance of impropriety by the State's Attorney's office. In *Lykins*, an Assistant State's Attorney presented evidence to a grand jury regarding the defendant. The conflict arose because the attorney previously had represented, in an unrelated civil matter, the defendant. Lykens argued for dismissal of the indictment on the ground that the previous relationship of the attorney and defendant created the appearance of impropriety. The Court held:

> The proper action to be taken by a trial judge, when he encounters circumstances similar to those in the case at bar which he determines to be so grave as to adversely affect the administration of justice but which in no way suggest the bringing of a prosecution for improper motives . . . is to supplant the prosecutor, not bar the prosecution. Of course, a trial judge may determine that the facts presented to him are not sufficiently grave to require even this action. Normally, the evaluation of such circumstances is left to the sound discretion of the trial judge who is upon the scene and able to sense the nuances of that before him. Ordinarily an appellate court will not interfere with his conclusions as to the proper course of action to be followed in the absence of a showing of an abuse of discretion upon the part of the trial judge.

*Id.* at 85, 415 A.2d 1113.

In *Wiener v. State*, 290 Md. 425, 430 A.2d 588 (1981), the Court of Appeals addressed the issue of whether the presence

in the Public Defender's office of an undercover agent of the State in an unrelated matter violated the defendant's right to effective assistance of counsel.[7] The facts indicated that the agent, a law student, had discussed defense strategy and procedure of Wiener's case with an investigator in the Public Defender's office. Relying on the Supreme Court's opinions in *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) and *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), the *Wiener* Court remanded the case for a factual determination by the trial court of any prejudice resulting from the agent's exposure to privileged communication. Specifically, the Court held:

> If the trial court concludes on the restricted remand that there has been no prejudice in fact resulting to [the defendant] from the intrusion, then the motion to dismiss should be denied. If the trial court concludes that prejudice has resulted, then the approach should be to neutralize the taint by tailoring suitable relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial.

*Wiener*, 290 Md. at 438, 430 A.2d 588 (internal quotation omitted).

 Appellant distinguishes *Young* and *Wiener* from the instant case by arguing that "[u]nlike in *Young* and *Wiener*, however, privileged information was communicated by the reviewing attorneys to the prosecuting attorneys." The trial court addressed this issue and found that even if documents that should have been screened because of their privileged nature were disclosed to the State,

> that material was obtained in good faith by the prosecution pursuant to a lawfully executed search warrant and after an

---

7. The undercover agent was a law student asked by the Attorney General's office to seek employment in the Public Defender for Anne Arundel County, T. Joseph Touhey's, private law office. The State was investigating Touhey for alleged misuse of state services and personnel. The student was instructed that, if he failed to receive employment in Touhey's private practice, that he should apply to the Public Defender's office.

appropriate screening mechanism was established to preclude the disclosure of this information. It's disclosure to the assigned prosecutors was at best inadvertent, and there is absolutely no prosecutorial misconduct involved in the review of this material that was disclosed to the assigned prosecutors. Even assuming that the assigned prosecutors have inadvertently obtained possession of material that is protected by the attorney-client privilege, the appropriate remedy is to bar the State from using the material in its prosecution of Ms. Newman.[8]

Appellant relied on *Zaal v. State*, 326 Md. 54, 602 A.2d 1247 (1992), both at trial and on appeal to assert that the State was required to turn all of the seized documents over to the court for its review and privilege classification, *in camera*. The trial court found *Zaal* inapplicable because it involved privileged information held by a third party.

*Zaal* involved a request by a defendant in a sexual abuse case to view the student records of his accuser. The trial court in *Zaal* conducted an *in camera* review of the school records. The court determined that there was no information in the documents that would be of such benefit to the defense as to outweigh the privacy interests of the accuser.

The court in *Zaal* found that there were alternatives to *in camera* review. Quoting from the Supreme Court of Massachusetts in *Massachusetts v. Stockhammer*, 409 Mass. 867, 570 N.E.2d 992, 1002 (1991), the *Zaal* court wrote:

Trial judges have a broad discretion to control the proceedings before them. There is no reason why they cannot take

---

8. We wholly agree with the trial court's analysis. *See infra.* Furthermore, although not necessary to the resolution of this matter, our review of the documents alleged by appellant to have been privileged and yet disclosed, yields the conclusion that the documents were not privileged. While the events and conversations listed in the first document may at one time have been privileged, when appellant shared those events with the unknown third party the privilege was lost. The privilege was lost in the e-mail as well by allowing a third party, Ms. Landry, to not only read the contents of the e-mail but to respond to Mr. Juccam within the e-mail chain and on appellant's computer.

steps to ensure that breaches of confidentiality attending discovery are limited only to those absolutely and unavoidably necessary to the preparation and presentation of the defendant's defense.

*Zaal*, 326 Md. at 84, 602 A.2d 1247. The Court went on to list a number of alternative ways to screen privileged information that allowed inspection by the attorneys. The Court concluded that if precautions are taken "such breaches of confidentiality need not be any more intrusive or harmful than those attending *in camera* review of records by the judge alone." *Id.* (quoting *Stockhammer*, 409 at 1002). The *Zaal* court held that on remand "the court may elect to review the records alone, to conduct the review in the presence of counsel, or to permit review by counsel alone, as officers of the court, subject to such restrictions as the court requires to protect the records' confidentiality." *Zaal*, 326 Md. at 88, 602 A.2d 1247.

We fail to see how *Zaal* holds, as appellant suggests, that the only appropriate review procedure of privileged information is by *in camera* review. Our reading of *Zaal* is that the Court recognized any number of alternative, yet appropriate, review procedures.[9]

We find that the screening procedure employed by the State in this case was sufficient to protect appellant's privacy interest. Accordingly, we find that the trial court properly exercised its discretion in denying the motion to disqualify the entire Montgomery County State's Attorney's office. As in *Young*, the mere appearance of impropriety is not itself suffi-

---

9. We also note that to require the courts to conduct *in camera* review of potentially privileged documents seized from a suspect's house would place an extreme burden on the already taxed judicial system. The testimony at trial was that it took over two weeks to review the documents. The trial courts of this State are simply not equipped with the personnel to perform such a time consuming task, especially when there are alternatives available that can safely protect the privilege. *See United States v. Zolin*, 491 U.S. 554, 571, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989)(recognizing the potentially extensive burden placed on trial courts when asked to conduct *in camera* reviews and finding them necessary only "when justified" or "in appropriate cases").

cient to warrant disqualification of an entire State's Attorney's office.

Furthermore, if privileged information was disclosed, the proper remedy would be to bar use of the material at trial, not to disqualify the State's Attorney's office. See *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.,* 351 Md. 396, 414, 718 A.2d 1129 (1998)(holding that the attorney-client privilege is a rule of evidence). We analogize to situations where the State's Attorney is privy to confessions later deemed to be in violation of *Miranda.* The result is suppression of the confession, not disqualification of the prosecuting office, notwithstanding the fact that the prosecution has gained insight, through the confession, that it would otherwise not have had. See *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)(discussing the exclusionary rule and violations of *Miranda* ); *see also* Andrew V. Jezic, Frank Molong, & William E. Nolan, Maryland Law of Confessions ch. 14 (2003)(discussing use of evidence from a *Miranda* violation).

## II. The Crime–Fraud Exception to the Attorney–Client Privilege

Appellant's second ground on appeal is that the trial court erred in allowing appellant's domestic relations lawyer, Steven Friedman, to testify regarding statements made by appellant during his representation of her in the custody and divorce case.

As a preliminary matter, we note that the only ground for objection to Mr. Friedman's testimony that has been preserved for review by this Court is on the basis of privilege. *See* Md. Rule 4–323(a)( [a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon as the grounds for the objection become apparent.) [10] Furthermore, it is clear from the briefs and transcript in this

---

**10.** Appellant was allowed a continuing objection to Mr. Friedman's testimony on the basis of privilege. Additionally, the trial court indicated that any additional objections to the testimony could be made throughout Mr. Friedman's testimony. No further objections, however, were made.

matter that the issue presented by Mr. Friedman's testimony has been obfuscated. The issue before this Court is not whether Mr. Friedman acted properly when he disclosed certain information to a Circuit Court before the custody hearing on September 4, 2001. That determination is for another court on another day.[11] This Court is only concerned with the appeal in this case, *Elsa Newman v. State,* a criminal prosecution for conspiracy to commit murder, among other things.

Our review of the relevant case law reveals that the proper issue is whether Mr. Friedman's court ordered testimony was proper under the attorney-client privilege, not Rule 1.6 of the Maryland Rules of Professional Conduct.[12] Although the two concepts are commonly used interchangeably, there is a legal distinction. Both concepts provide protection from disclosure of confidential information; however, the former controls court ordered testimony and the latter is an ethical obligation to either disclose or refrain from disclosing certain information.

The distinction between the ethical rules that govern confidentiality and the evidentiary rule of attorney-client privilege were thoroughly discussed by the Court of Appeals in *In re Criminal Investigation No. 1/242Q,* 326 Md. 1, 602 A.2d 1220 (1992) and *Parler & Wobber v. Miles & Stockbridge, P.C.,* 359 Md. 671, 756 A.2d 526 (2000).

---

11. We make no determinations regarding the appropriateness of Mr. Friedman's action of September 4, 2001.

12. Rule 1.6 of the Maryland Rules of Professional Conduct provides:
 (a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).
 (b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:
 (1) to prevent the client from committing a criminal or fraudulent act that the lawyer believes is likely to result in death or substantial bodily harm or in substantial injury to the financial interests or property of another.

■ As discussed in *In re Criminal Investigation No. 1/242Q,*

> [t]he attorney-client privilege applies in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client. The rule of client-lawyer confidentiality applies in situations other than those where evidence is sought from the lawyer through compulsion of law.

326 Md. at 5, 602 A.2d 1220 (internal citation omitted). When information is sought from an attorney by compulsion of law, "only the attorney-client privilege, not the broader rule of confidentiality, protects against disclosure." *Id.* *See also Parler,* 359 Md. at 689, 756 A.2d 526 (quoting *In re Criminal Investigation No. 1/242Q* ). The result is that information sought through discovery must be produced unless protected by the attorney-client privilege. *Parler,* 359 Md. at 690, 756 A.2d 526 ("Thus, relevant evidence sought through discovery, unless protected by the attorney-client privilege, must be produced and the ethical duty of confidence takes a back seat to the quest for truth."). As Mr. Friedman was under court order to testify in this matter, we find that our inquiry is thus governed by the narrower attorney-client privilege rather than by the broad confidentiality provisions of the Rules of Professional Conduct.

The attorney-client privilege is codified in Md.Code (1974, 2002 Repl.Vol.), § 9–108 of the Courts and Judicial Proceedings Article, and reads, "A person may not be compelled to testify in violation of the attorney-client privilege." The Maryland courts have adopted Wigmore's definition of the attorney-client privilege:

> (1) Where legal advice of [any] kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal adviser,(8) except the protection [may] be waived.

*Parler*, 359 Md. at 691, 756 A.2d 526 (internal citations omitted).

 Although the attorney-client privilege has long been a part of our legal system (*see Harrison v. State*, 276 Md. 122, 131, 345 A.2d 830 (1975)(tracing the history of the privilege back as far as the reign of Elizabeth I (1558–1603))), it is not an "inviolable seal upon the attorney's lips." *Parler*, 359 Md. at 691, 756 A.2d 526 (internal citation omitted). The purpose of the privilege is to encourage the free flow of communication between client and attorney without fear of disclosure. *Id.* at 690, 756 A.2d 526. It does, however, "create evidentiary inequities between parties during discovery and the absence of fact and truth at trial." *Id.* at 691, 756 A.2d 526. Because the privilege withholds valuable information from the fact finder, it is narrowly construed by the courts. *Id. See also United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989); *Cutchin v. State*, 143 Md.App. 81, 90, 792 A.2d 359 (2002); *E.I. du Pont de Nemours & Co. v. Forma-Pack Inc.*, 351 Md. 396, 415, 718 A.2d 1129 (1998).

 The privilege is not absolute. "It does not restrict disclosure of every aspect of what occurs between the attorney and the client." *In re Criminal Investigation No. 1/242Q*, 326 Md. at 11, 602 A.2d 1220. For instance, it does not protect communication made in furtherance of future crimes.[13] It is the seeking of advice in furtherance of a future wrongful act that implicates the crime/fraud exception. *See Clark v. United States*, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933);*In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir.1994)("The crime fraud exception to the attorney-client privilege provides

---

**13.** See *United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989):

> The attorney client privilege must necessarily protect the confidences of wrongdoers, but the reason for the protection—the centrality of open client and attorney communication to the proper functioning of our adversary system of justice—"ceas[es] to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing*, but to *future wrongdoing*."

Quoting 8 Wigmore, § 2293, p. 573 (emphasis in original).

that a client's communications with an attorney will not be privileged if made for the purpose of committing or furthering a crime or fraud.")(quoting *In re Grand Jury Subpoena*, 884 F.2d 124, 127 (4th Cir.1989)); *Carter v. Maryland*, 149 Md. App. 509, 520, 817 A.2d 277 (2003)(The attorney-client privilege does not apply to a request by a client to his attorney to present perjured testimony.) (Citing *State v. Lloyd*, 48 Md. App. 535, 546, 429 A.2d 244 (1981).) [14]

In 1933 the Supreme Court of the United States, in an opinion by Justice Cardozo, eloquently stated the nature of the crime/fraud exception:

> There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told.... To drive the privilege away, there must be "something to give color to the charge;" there must be "prima facie evidence that it has some foundation in fact." When that evidence is supplied, the seal of secrecy is broken.... A privilege surviving until the relation is abused and vanishing when abuse is shown to the satisfaction of the judge has been found to be a workable technique for the protection of the client and attorney.

*Clark v. United States*, 289 U.S. 1, 15–16, 53 S.Ct. 465, 77 L.Ed. 993 (1933)(internal citations omitted).

Having identified the proper issue before us, we turn now to the testimony presented at appellant's trial by her former counsel.

---

**14.** *See also* McCormick on Evidence, § 95, p. 380 (John W. Strong, et al., eds., Practitioner Treatise Ser., 5th ed.1999):

> Since the policy of privilege is that of promoting administration of justice, it would be a perversion of the privilege to extend it to the client who seeks advice to aid him in carrying out an illegal or fraudulent scheme. Advice given for those purposes would not be a professional service but participation in a conspiracy. Accordingly, it is settled under modern authority that the privilege does not extend to communications between attorney and client where the client's purpose is the furtherance of a future intended crime or fraud.

The record indicates that on June 28, 2002, the trial court held a hearing on a motion by appellant to exclude the testimony of Mr. Friedman. Under order of the court, Mr. Friedman testified that on September 4, 2001, the morning of trial in the custody dispute, he disclosed to Judge Scrivener of the Family Court in Montgomery County that during his representation of appellant she had made statements that he believed were credible and fell within the crime exception to Rule 1.6. Although the court was unaware of the exact statements, it held that, based on Mr. Friedman's background, experience, and almost two-year relationship with appellant, Mr. Friedman acted in accordance with the requirements of Rule 1.6 for disclosure of confidential information.

Although the proper inquiry was whether the information to be disclosed fell within an exception to the attorney-client privilege rather than the crime exception to the ethical rule, the outcome in this case is the same. The information was within the crime exception to the attorney-client privilege and thus admissible.

At trial, still under order of the court, Mr. Friedman testified to the following occurrences:

On Friday, August 31, 2001, he arrived at his office to find appellant in "an absolute rage." The purpose of the meeting was to go over appellant's testimony for the custody trial taking place on the following Tuesday. Friedman testified that appellant said "a lot of things that concerned [him]" during the course of the day. Specifically, there came a time when "she stopped being in a rage, got very quiet, very thoughtful, and tilted her head a little, and her eyes rolled up, and spoke in a voice that was different from her normal voice." She then said "You know, I don't have to kill both children. I only need to kill Lars because I can save Herbie, and then Arlen will go to jail and get what he deserves because he is a criminal, and I can at least save Herbie." Friedman continued by stating that appellant had told him, his associate Beth Rogers, and his secretary on different occasions when she

would get upset and despondent that, "they are being tortured. I am going to kill them[,]" referring to her children.

When asked if appellant and Landry had ever discussed killing Slobodow in front of him, Friedman testified that they had on two occasions. Specifically:

> FRIEDMAN: I was reading a report about something, and [Elsa] was talking to Margie about shooting him and framing Arlen, and I will have to have an alibi—you know, if— you know, should I do it, or how should we do it? Should we hire someone, and she said, "No. No. Ruthann said always do it yourself because when you try and hire somebody you get caught." I mean, that is what happened to Ruthann, she hired a cop.[15]

When asked who said that they should frame Arlen, Mr. Friedman replied:

> FRIEDMAN: It was a discussion.
>
> THE STATE: Back and forth?
>
> FRIEDMAN: Correct, that we—that if they—if—if Elsa killed—if Elsa or Margery killed Lars, Arlen would be blamed, and then he would go to jail. They talked about planting evidence in his house. They—
>
> THE STATE: What kind of evidence?
>
> FRIEDMAN: Pornography. They—they were convinced that—Elsa was convinced that Arlen was taking pornographic pictures of the kids, and the kids were saying things to get.... If the kids were saying what she said they were saying, that is pretty serious, and she thought that he was using his video business to take pornographic pictures of the kids. So they would sit in my office, and one time they said they were going through the trash—they were going into his backyard, and they also had Margery going through his

---

**15.** References to Ruthann are Ruthann Aron. Ms. Aron attempted to kill her allegedly abusive husband. According to Friedman, appellant "idolized Ruthann Aron and Elizabeth Morgan." Morgan was imprisoned for taking her child out of the country and refusing to tell police where the child was because she believed that her husband was abusing the child.

garbage, and I said "You can't do that. That is illegal. I can't hear that kind of stuff," and they were bringing me into this relationship, and it is why I had to bar Margery from coming in the office. I—I couldn't be in that position.

THE STATE: Did this conversation occur on more than one occasion?

FRIEDMAN: Yeah. I can recall two distinct conversations. I can see them sitting in front of my desk in their—each in a chair.[16]

Applying the standard enunciated many years ago by the Supreme Court, to wit, a requirement that there be "something to give color to the charge" and "prima facie evidence that it has some foundation in fact," we are satisfied that the testimony of Mr. Friedman falls squarely within the crime-fraud exception.

Appellant argues in her brief that the State failed to meet its burden in establishing the crime-fraud exception. Appellant states "Mr. Friedman did not testify to any facts that would reasonably indicated [sic.] that statements he heard from Ms. Newman caused him to act 'to the extent' to 'prevent' Ms. Newman from causing harm to anyone." This argument, however, while applicable to a challenge to disclosure under Rule 1.6, is not relevant to a challenge to attorney-client privilege.

 As discussed above, to defeat the attorney-client privilege there is no requirement that the information be disclosed

---

**16.** Friedman testified that he decided to disclose the statements during the weekend before the September 4th hearing.

Friedman: That Friday evening when she sat back and got very calm and talked about only have to kill one kid, I couldn't live with that. I was concerned that she would kill Arlen, or Margery would, or both of them, and I could have lived with that, I wouldn't like it, but I am—I have been a criminal defense attorney. I deal with that. I couldn't deal with a kid getting killed, and I called my ethics advisor. I called a Court of Appeals judge. I called a psychologist that is very knowledgeable about borderlines and psychology, in general, and I sought their advice, and I came to the conclusion that I was an accessory before the fact of murder if I didn't do something, and that is why they have rule 1.6.

"to the extent" necessary to "prevent" a crime. Rather, it is the nature of the statement itself, language contemplating a future crime or fraud that destroys the protection embodied in the privilege. To defeat the privilege, the State was required to supply evidence sufficient to "give color to the charge [that the statements contemplated future criminal or fraudulent acts]" and to establish "prima facie evidence that it has some foundation in fact." When this burden was met the seal of secrecy arising from the attorney-client privilege was broken. *Clark*, 289 U.S. at 15, 53 S.Ct. 465.

Mr. Friedman testified to statements made by appellant that clearly showed an intent to commit future crimes, to wit, the murder of her child, the murder of her ex-husband, and the planting of child pornography in her ex-husband's home. Based on Mr. Friedman's two-year relationship with appellant and his obligations as an officer of the court, there was sufficient evidence to believe that the statements had a foundation in fact. We, therefore, hold that the State satisfied its burden and the trial court did not err in allowing the testimony of Mr. Friedman.

### III. Voir Dire

Appellant's third ground for appeal is that the trial court erred in denying appellant's requested voir dire questions concerning potential bias of the venire. Appellant wanted the court to ask the following questions:

Has any member of the jury been accused or charged with child abuse, physical abuse, or domestic violence?

Is any member of the jury a member of groups advocating father's rights in divorce and custody hearings?

As a preliminary matter, appellee raises the issue of whether appellant properly preserved the voir dire issue for review by this Court. Appellee argues that appellant failed to make a timely objection at trial when the court refused to ask the requested questions.

Md. Rules 4–323(c) and (d) govern the method of making objections to rulings or orders, other than evidentiary, by the trial court. They read:

4–323(c): For purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time of the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court. The grounds for the objection need not be stated unless these rules expressly provide otherwise or the court so directs.

4–323(d): A formal exception to a ruling or order of the court is not necessary.

Applying Rules 4–323(c) and (d) to the facts in this case, we find that the objection was properly preserved. The record reflects that appellant made two requests of the trial court to ask the questions listed above, first in writing and second at the close of the questioning section of voir dire. The discussion of the matter consisted of the following:

THE COURT: Is there any other request that any of you have concerning jurors that—

DEFENSE ATTORNEY H: Can I take a look? [17]

THE COURT: Yes.

DEFENSE ATTORNEY H: We did ask you to give the two questions (inaudible).

DEFENSE ATTORNEY M: We did ask you in our written voir dire to ask question [sic.] does any member of the jury panel a member of any (inaudible) a group that would advocate for the rights of (inaudible). Also ask if you do, a question has anyone in the jury panel been accused, charged, tried, convicted in a criminal or civil court in any case of child abuse? Again, ask you that—

---

17. Appellant was represented by two attorneys, Mr. Barry H. Helfand and Mr. David A. Martella. To distinguish between which attorney was speaking we have indicated that the speaker was defense attorney H or M.

DEFENSE ATTORNEY H: At any (inaudible).

THE COURT: Hold on just a second. I think the questions I have asked have covered those. I am not going to give any additional questions.

We find that appellant's counsel made known to the court the action that they wished it to take. Furthermore, the rule does not require the objection to be stated with particularity or specific language. We hold, therefore, that the objection was properly preserved.

We turn now to the question presented, whether the trial court abused its discretion in failing to ask the venire the requested voir dire questions.

The trial court asked the venire a series of questions and had them stand when their answer was yes. The court then had each person who had answered a question in the affirmative approach the bench one at a time. The judge then repeated the question that the potential juror had answered affirmatively, inquired about the basis of their answer, and asked if the reason for their answer would impair their ability to be fair and impartial in this case.

As the Court of Appeals stated in *State v. Thomas*, 369 Md. 202, 206, 798 A.2d 566 (2002), the principles governing the conduct and scope of voir dire are well-known and well-settled in Maryland. Maryland employs a significantly limited voir dire practice, *Dingle v. State*, 361 Md. 1, 32, 759 A.2d 819 (2000), with two underlying principles to guide the trial courts of the State. First, "the scope of voir dire and the form of the questions propounded rest firmly within the discretion of the trial judge." *Id.* (quoting *Perry v. State*, 344 Md. 204, 218, 686 A.2d 274 (1996)(internal citations omitted)). And second, "the sole purpose for the inquiry is to establish cause for disqualification." *Id.* at 33, 759 A.2d 819 (quoting *Burch v. State*, 346 Md. 253, 293, 696 A.2d 443 (1997)).

The disqualification inquiry focuses on two grounds: (1) an examination to determine whether prospective jurors meet the minimum statutory qualifications for jury service,

*see* Maryland Code (1974, 1989 Repl.Vol., 1992 Cum. Sup.), Courts & Judicial Proceedings Article, § 8–207; or (2) " 'an examination of a juror ... conducted strictly within the right to discover the state of mind of the juror in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him.' "

*Davis v. State,* 333 Md. 27, 35–36, 633 A.2d 867 (1993)(quoting *Bedford v. State,* 317 Md. 659, 671, 566 A.2d 111 (1989)(internal citation omitted)).

▆▆▆ In *Boyd v. State,* 341 Md. 431, 436, 671 A.2d 33 (1996), the Court of Appeals clarified the scope of voir dire further by saying that the right to an impartial jury is the right to have questions asked that "concern a specific cause for disqualification." Furthermore, "the questions should focus on issues particular to the defendant's case so that biases directly related to the crime, the witnesses, or the defendant may be uncovered." *Thomas,* 369 Md. at 208, 798 A.2d 566. In *Dingle,* the Court wrote:

If there is any likelihood that some prejudices in the jurors' mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case.

*Dingle,* 361 Md. at 11, 759 A.2d 819 (quoting *Bedford,* 317 Md. at 671, 566 A.2d 111).

▆▆▆ Applying these principles to the case at bar, we hold that the trial court did not abuse its discretion in refusing to ask the requested voir dire questions. The questions asked by the trial court were sufficient to identify potential bias related to child abuse or custody as they relate to appellant's prosecution for conspiracy to commit murder.[18]

---

18. Although we find that the topics of child abuse and custody were adequately covered by the trial court, a determination of whether the issues are sufficiently intertwined in this prosecution for conspiracy to commit murder so as to be "directly related to the crime, the witnesses, or the defendant" *(Thomas,* 369 Md. at 208, 798 A.2d 566) and thus

At the beginning of the voir dire process, the trial court informed the venire of the basic facts of the case, including the fact that the State relied on appellant's failed attempts to gain custody of her children as the motive for the conspiracy. The court then asked a series of questions designed to draw out possible bias of the venire, including:

Does any member of the prospective jury panel feel such sympathy for persons in the defendant's circumstances that you would be biased in the defendant's favor. Likewise, does anyone harbor feelings that would bias you in favor of the prosecution? [19]

This question, in fact, did draw out potential bias relating to appellant's concerns. In response to the question, two members of the venire informed the court that they felt they could not be objective; one, because of a sister's drawn out custody battle and the other because of her relationship with children.

Having thoroughly reviewed the voir dire conducted in this matter and the relevant case law, we find no abuse of discretion. We therefore hold that the trial court did not err in refusing to ask the venire all of appellant's requested questions.

---

within the proper scope of voir dire, is not necessary to our resolution. Therefore, we express no opinion as to whether these topics are, in fact, within the scope of voir dire in this case.

**19.** In addition, the court asked the following questions:

Would any member of the prospective jury panel be able to base his or her verdict solely upon the evidence presented in court and the law as I define it for you, even if you disagree with the law without regard to sympathy, pity, passion, or other emotions?

Does any member of the prospective jury panel feel such sympathy for persons in the defendant's circumstances that you would be biased in the defendant's favor. Likewise, does anyone harbor feelings that would bias you in favor of the prosecution?

Has any member of the prospective jury panel or member of your immediate family ever had a prior experience in any criminal proceeding or event either as a party, juror, grand juror, witness, victim, or participant in any criminal proceeding such as being arrested or prosecuted for a crime?

Has anything occurred to you while sitting here today that you feel you should bring to my attention that would affect your ability to be fair and impartial in this case?

## IV. Mistrial and Right to Counsel

Appellant's fourth ground for appeal is that the trial court erred in denying her motion for a mistrial upon the State eliciting testimony about appellant's exercise of her constitutional right to counsel. Our review of the question presented is governed by the abuse of discretion standard. *See Klauenberg v. State,* 355 Md. 528, 555, 735 A.2d 1061 (1999) ("As this Court has said time and again, the decision whether to grant a motion for a mistrial is within the sound discretion of the trial court." (internal citations omitted)). Furthermore, "a reviewing court will not reverse the trial court unless the defendant clearly was prejudiced by the trial court's abuse of discretion." *Hunt v. State,* 321 Md. 387, 422, 583 A.2d 218 (1990). For the following reasons we hold that the trial court did not abuse its discretion.

On August 1, 2002, the State called Detective Susan Mercer, the lead investigator in the case to testify. During the course of direct exam the following colloquy occurred:

THE STATE: And did you have any conversation with Ms. Newman?

WITNESS: Yes.

THE STATE: Okay. Did you advise her of her rights?

WITNESS: Yes, sir.

THE STATE: And what rights did you advise her of?

WITNESS: That she has the right to remain silent, she had the right to an attorney. At which time she advised that she would like to consult with an attorney. Actually, she had an attorney waiting in the station lobby for her.

Defense counsel made a motion for a mistrial based on the elicitation of testimony concerning appellant's exercise of her constitutional right to counsel. The court inquired of the State the reason for eliciting the testimony:

THE STATE: Well, I agree that it shouldn't have been elicited, your Honor, but I don't think under the circumstances that it—having it stopped where it was, I think it can be cured either with an instruction, if they want one, if

not, we can simply move on to the rest of her testimony. There has been no extensive testimony about it, and I do think that we can simply move on and—and leave it up to them if they want a curative instruction.

THE COURT: All right. I am going to deny the motion for a mistrial. I propose to give an instruction to the jury to disregard testimony by the witness as to the contacts that she had with Ms. Newman after her initial observations of Ms. Newman.

DEFENSE COUNSEL H: I think under the rules I have to—I have to protect myself, say that I have to ask you to give such a cautionary instruction, but with all due respect, I would suggest to you there is no cautionary instruction that overcomes the prejudice that the courts have said occurs when this event happens. So with that, I object, and I appreciate your cautionary instruction.

A brief recess was held. When they returned the court made the following observation outside the presence of the jury:

THE COURT: I have reviewed the testimony of Detective Mercer that was prepared by cassette tape. Counsel has listened to that testimony in chambers, and I have prepared an instruction to give to the jury at this point which is as follows: You have heard testified that Elsa Newman was accompanied by an attorney when she appeared at the police station on January 10, 2002. This is not evidence to be considered by you. Ms. Newman is presumed to be innocent of the charges against her. You have heard evidence that Ms. Newman's ex-husband, Arlen Slobodow was shot on January 7 of 2002. Ms. Newman's house was searched following the shooting. She was aware of this on January 10, 2002. It is fully consistent with the presumption of innocence that anyone under these circumstances would appear and consult with an attorney at the police station to protect his or her interests, that is the instruction I propose to give. I would be glad to hear any suggestions or modifications by anyone concerning this, but after listen-

ing to the testimony of Detective Mercer, I do not feel that a mistrial is warranted under the circumstances.

The instruction was then given to the jury.

Appellant argues that "the mere mention that a defendant had been advised of his rights is reversible error."

In *Dupree v. State*, 352 Md. 314, 722 A.2d 52 (1998), which appellant argues, "the court unanimously found that the mere mention that a defendant had been advised of his rights is reversible error" was decided on an evidentiary basis with the Court intentionally refraining from deciding the constitutional question. The Court, in fact, held that "because the disputed testimony lacked the threshold relevancy necessary for admissibility, the trial court abused its discretion in allowing its presentation to the jury."

In explaining how the Court came to its conclusion, it reviewed a number of cases, including the Court of Special Appeals' case, *Zemo v. State*, 101 Md.App. 303, 646 A.2d 1050 (1994).

In *Zemo*, the Court of Special Appeals wrote:

What legitimate relevance to the appellant's guilt or innocence, we ask initially, did it possibly have that he has been "read ... *Miranda?*" If he had given a "Mirandized" statement that the State were offering in evidence, then, to be sure, the State might have to show its compliance with *Miranda* at the very threshold of admissibility. Where no statement was being offered and tested for admissibility, on the other hand, the appellant's silence in response to the *Miranda* warnings was immaterial. Indeed, the very fact that appellant had even been interviewed was immaterial.

*Zemo*, 101 Md.App. at 315, 646 A.2d 1050. The passage carried with it the following caveat:

Our mention of the gratuitous reference to the giving of *Miranda* warnings is only for the purpose of placing in fuller context the subsequent gratuitous reference to the appellant's silence in response to those warnings. *We are by no means intimating that a gratuitous reference to the*

*giving of* Miranda *warnings would ever, in and of itself, constitute cause for reversal. Any citation of our remarks above as authority for such a proposition would be an erroneous citation as support for a principle for which this opinion does not stand.*

*Zemo,* 101 Md.App. at 316 n. 1, 646 A.2d 1050 (emphasis added).

The Court in *Dupree* explained that its use of the language from *Zemo* was not contrary to the caveat placed on the quotation. Rather,

[t]hat the passage may lack authority for finding a constitutional error under the circumstances of the present case does not detract from its essential contention: the irrelevancy of Miranda warnings succeeded by the arrestee's silence.

*Dupree,* 352 Md. at 332, n. 3, 722 A.2d 52.

█ We conclude that it is by far the better practice for the State to refrain from eliciting testimony regarding a defendant's exercise of his or her *Miranda* rights. As the Courts in *Zemo* and *Dupree* make clear, unless the testimony is being used for a proper purpose in connection with a post-*Miranda* statement, the line of questioning is irrelevant. It does not, however, "in and of itself, constitute cause for reversible error." *Zemo,* 101 Md.App. at 316 n. 1, 646 A.2d 1050.

Having concluded that testimony related to appellant's exercise of her rights pursuant to *Miranda* is not in and of itself reversible error, we are left with the question of what is the appropriate remedy when such evidence inadvertently is offered.

We begin by recognizing that there is rarely, if ever, a perfect trial from an evidentiary standpoint. The reality is that inadmissible evidence finds its way before a jury and it falls on the trial court to correct the error. We said in *Zemo,* "[a] few smudges of prejudice here and there can be found almost universally in any trial and need to be assessed with a cool eye and realistic balance[.]" *Zemo,* 101 Md.App. at 306, 646 A.2d 1050. Appellant argues that the only proper remedy in this case is to grant a mistrial. We disagree.

 "It is well-settled that a decision to grant a mistrial lies within the sound discretion of the trial judge." *Carter v. State*, 366 Md. 574, 589, 785 A.2d 348 (2001). That decision will be disturbed on appeal only upon a showing of abuse of discretion resulting in prejudice. *Id.* (citing *Klauenberg v. State*, 355 Md. 528, 555, 735 A.2d 1061 (1999)). In deciding whether to grant a mistrial the trial court

> must assess the prejudicial impact of the inadmissible evidence and assess whether the prejudice can be cured. If not, a mistrial must be granted. If a curative instruction is given, the instruction must be timely, accurate, and effective.

*Carter*, 366 Md. at 589, 785 A.2d 348.

 In the instant case, an objection was made immediately upon Detective Mercer's testimony regarding appellant exercising her right to counsel. The trial judge properly recognized the inadmissibility of the testimony. A brief recess was taken, during which the trial judge and counsel reviewed the testimony. The court concluded that the proper remedy was to give a curative instruction. The court explained to the jury that they were to disregard the testimony and that it was entirely consistent with appellant's right to counsel and presumption of innocence for her to arrive at the police station represented.

Appellant takes issue, however, with the curative instruction. In addition to arguing that the mere mention that a defendant has been advised of her rights is reversible error, appellant argues that the cautionary instruction given by the trial court was prejudicial. She relies on the case of *Hardaway v. State*, 317 Md. 160, 562 A.2d 1234 (1989), to support her argument.

*Hardaway* addressed the issue of prejudice arising from a curative instruction when the instruction is given over the defendant's objection.[20] *Hardaway*, however, is distinguish-

---

**20.** Hardaway involved a "no inference" instruction given *sua sponte* and over defense objection when the defendant did not testify at trial.

able from the current case because, unlike appellant's situation, there was no evidentiary error that needed to be corrected. The instruction was the error rather than an attempt to cure one. It would be wholly inconsistent to recognize that statements like the one made by Detective Mercer need not result in a mistrial but to then prohibit a trial judge from taking curative actions.

 The only remaining issue is whether " 'the damage in the form of prejudice to the defendant transcended the curative effect of the instruction.' " *Carter*, 366 Md., at 589, 785 A.2d 348 (quoting *Rainville v. State* 328 Md. 398, 408, 614 A.2d 949 (1992)(internal citation omitted)). In deciding whether the prejudice transcended the instruction, we consider a number of factors.[21] They are:

> [W]hether the reference to [the inadmissible evidence] was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; and whether a great deal of other evidence exists....

*Guesfeird v. State,* 300 Md. 653, 659, 480 A.2d 800 (1984)(quoted by *Carter,* 366 Md. at 590, 785 A.2d 348; *Rainville,* 328 Md. at 408, 614 A.2d 949). "No single factor is determinative in any case. The factors themselves are not the test, but rather, they help to evaluate whether the defendant was prejudiced." *Guesfeird,* 300 Md. at 659, 480 A.2d 800.

 Applying these factors to the case before us, we find that the prejudice from the statement did not transcend the

---

The Court held that, except in special circumstances, the desire of the defendant to not have the instruction given should be determinative. *Hardaway,* 317 Md. at 169, 562 A.2d 1234.

**21.** The factors to be considered were first applied in Maryland by the Court of Appeals in *Guesfeird v. State,* 300 Md. 653, 659, 480 A.2d 800 (1984).

curative instruction. The vast majority of Detective Mercer's testimony dealt with issues related to Ms. Landry. Of the 20 pages of trial transcript containing the testimony of Detective Mercer, only two pages directly concern appellant.[22] The two pages covered an identification of appellant and the statement in question. We are, of course, not suggesting that for a testimonial mistake to be of reversible magnitude it must meet some quantitative test. We are merely placing the statement in context—a context that includes five-days' worth of testimony.

Contrary to appellant's assertion that the State referenced the inadmissible testimony in its closing argument, we find that it was a one-time error. We decline to elaborate on this point beyond saying that when read in context, the State's closing argument that "the plan" included "what they were going to do after the shooting" clearly referenced the bigger picture of how appellant would get custody of her children after the murder, not a plan to both exercise their right to counsel.

We hold that any prejudice suffered by appellant because of the inadmissible testimony of Detective Mercer was cured by the trial court's instruction. The court properly exercised its discretion in denying the motion for a mistrial and granting a curative instruction. Relief sought on these grounds is therefore denied.

## V. Character Evidence

Appellant next argues that the trial court committed reversible error by allowing various forms of character evidence to be introduced in the State's case-in-chief. She raises objection to four offerings of testimony appellant alleges to be character evidence: (1) characterizations of the Newman–Landry relationship; (2) evidence of an unrelated fraud alleged to have

---

**22.** Detective Mercer testified that Ms. Landry's cell phone rang while she was being processed. The caller I.D. number that appeared on the phone was later identified as belonging to the residence where appellant was staying at the time. The remainder of the testimony made no mention of appellant.

been committed by appellant and Ms. Landry; (3) testimony about the credibility of child abuse allegations against the victim; and (4) testimony related to financial conveyances that occurred between appellant and Ms. Landry during the divorce proceedings. We will address each incident in turn.

### (1) Characterizations of the Newman–Landry Relationship

██ Appellant first argues that the trial court abused its discretion by allowing Mr. Slobodow to testify regarding the nature of appellant's and Ms. Landry's relationship. Specifically, appellant argues that "[a]n important pillar supporting the State's case was the testimony of Ms. Newman's alleged character trait for being domineering over Ms. Landry." And that the "testimony was presented for the sole purpose of suggesting to the jury that [Newman] acted in conformity with that character trait with regard to this crime."

Mr. Slobodow testified that:

Elsa was very domineering over Margie. She had Margie do small tasks, you know, be a messenger, you know, do this, do that, rake the leaves, look after Herbie, baby-sit, all kinds of things, and she also kind of took over the planning of Margie's career at the State Department.

. . . .

Well, she was deeply involved in everything Margie did in terms of her work at the State Department, and the State Department is kind of like a complex work place where you have to bid on jobs, and there's sometimes competition among your coworkers, and I guess it can be kind of a slippery environment, and Elsa would advise her very closely over, you know, who she should be talking to, who she should avoid. Elsa drafted letters for Margie and reviewed memos, and basically played a very integrate role in the planning of her career.

Appellant objected to the questions and the court overruled the objection. In other testimony, to which there was no

objection, Mr. Slobodow testified that "they were very deeply involved in each others' lives."

In response, the State argues first that the issue was not properly preserved because appellant failed to object to earlier testimony by Mr. Slobodow that discussed the nature of the relationship between appellant and Ms. Landry. The State's second argument is that, even if the issue was properly preserved, the testimony was not offered to establish a character trait within the meaning of Md. Rule 5–404(a) but "to emphasize the status of [appellant's and Ms. Landry's] relationship."

Assuming, *arguendo*, that the objection was properly preserved, we hold that the testimony in question is not character evidence within the meaning of Md. Rule 5–404(a)(1).

Maryland Rule 5–404(a)(1) reads: "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion[.]" Professor McLain defines "character evidence" within the Rule as "proof either of a person's general moral character or of a specific character trait, such as honesty, carefulness, generosity, violence, sobriety, or truthfullness." McLain, Maryland Evidence § 404:1(a)(i)(2001). See also Black's Law Dictionary 576 (7th ed.1999)(defining character evidence as "[e]vidence regarding someone's personality traits; evidence of a person's moral standing in a community, based on reputation or opinion.") Professor McLain continues by noting that the propensity Rule, Md. Rule 404(a)(1), "makes character evidence inadmissible if offered as substantive, circumstantial proof that a person acted in accordance with *his or her good or bad character* on a particular occasion[.]" McCain, § 404:1(a)(iii)(emphasis added).

The testimony offered by Mr. Slobodow was not evidence of appellant's good, bad, or general moral character, nor do we view it as evidence of a specific character trait. It was evidence of the close relationship between the two women, not appellant's general character. Furthermore, considering the nature of the crime charged—conspiracy to commit murder—

the relationship of the two women is all the more relevant. We, therefore, find that the testimony was properly admitted.

### (2) Testimony of Tim O'Brien

■ Appellant next argues that the trial court abused its discretion in allowing Tim O'Brien to testify regarding his interactions with appellant and Ms. Landry while they lived in London. Specifically, appellant claims that Mr. O'Brien's testimony amounted to "bad acts" evidence prohibited by Md. Rule 5–404(b).

For the reasons set forth below we find that Mr. O'Brien's testimony did not amount to "bad acts" testimony and was properly admitted. Furthermore, the trial court properly exercised its discretion in limiting the scope of Mr. O'Brien's testimony. *See Oken v. State*, 327 Md. 628, 669, 612 A.2d 258 (1992)("Generally speaking, the scope of examination of witnesses at trial is a matter left largely to the discretion of the trial judge and no error will be recognized unless there is clear abuse of discretion.") (Citing *Trimble v. State*, 300 Md. 387, 401–02, 478 A.2d 1143 (1984), cert. denied, 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985)).

Prior to Mr. O'Brien's testimony, a bench conference was held in which appellant objected to the testimony. The State proffered that O'Brien would testify that he was stationed in London with Ms. Landry, that they were neighbors, and that Landry had referred to Newman as her sister and the children as her nephews. This evidence was offered to bolster the State's theory of how close the two women were and to counter appellant's claim that the only person who would characterize the closeness of the two women was Mr. Slobodow. The court properly allowed testimony to this extent.

The State also sought to introduce testimony that O'Brien was responsible for issuing identification badges, that only dependents could acquire an identification badge, and that appellant received a badge. The trial judge properly excluded this section of O'Brien's testimony recognizing that, given O'Brien's job, the testimony related to the badges could create

the inference that something was done that could amount to "other crimes" evidence.

Appellant contends that the State was allowed to elicit testimony from O'Brien that he worked in security at the embassy, a job that in addition to other responsibilities, included "conducting investigations against embassy employees who might have had allegations of misdeeds against them." This testimony, continues the argument, when combined with O'Brien's testimony that only embassy employees lived in their apartment building, and Slobodow's testimony that appellant lost the opportunity to live for free when Landry left London, created an inference that the two had perpetrated a fraud, a prior bad act.

Appellant correctly states the law with regard to the admission of prior "bad acts" pursuant to Md. Rule 5-404(b). Evidence of prior "bad acts" is inadmissible at a criminal trial "to prove the character of a person in order to show action in conformity therewith." Md. Rule 5-404(b). Appellant's argument fails, however, because the testimony in question does not amount to prior "bad acts" evidence.

We are not persuaded that O'Brien's job description coupled with testimony that appellant and Landry lived together in embassy housing is sufficient to generate an inference of prior "bad acts" as proscribed by Md. Rule 5-404(b). First, O'Brien testified that his job at the embassy included a laundry list of responsibilities of which investigating State Department employees was but one, and that "the first priority is to prevent attacks from—against embassy facilities or personnel[.]" Second, his statement that "only embassy employees" lived in the apartment complex does not, in our view, result in an inference that appellant and Landry were breaking any rules by both living in the apartment, much less committing a crime or fraud. The jury could have just as easily inferred that, as long as one resident was an embassy employee, the residency rule was satisfied. Even with Slobodow's testimony that appellant benefitted from Landry's post in London, we think it

too great of a leap to conclude that the testimony amounted to "bad acts" testimony.

The testimony of Mr. O'Brien was properly admitted and did not constitute "bad acts" within the meaning of Md. Rule 5–404(b).

### (3) Testimony Related to Child Abuse Allegations

Appellant next contends that the testimony of three law enforcement officers who investigated the allegations of child abuse against Mr. Slobodow should not have been admitted. She raises three points in support of this argument: (1) the testimony was hearsay upon hearsay; (2) the testimony amounted to inadmissible "other crimes" evidence; and (3) the testimony amounted to opinion testimony of credibility. The first two points of this argument deserve little attention. We will, however, go into more detail regarding the third.

■ At the outset it is important to recognize that the record clearly indicates that the testimony of the three officers was offered solely to show the effect that the closing of the cases against Mr. Slobodow as "unfounded" had on appellant. The trial court instructed the jury on two separate occasions that the testimony they had heard, the testimony that the cases were closed "unfounded," was being offered solely for the effect on appellant's state-of-mind and not for the truth of the matter asserted. " 'When curative instructions are given, it is presumed that the jury will follow them.' " *Tibbs v. State*, 72 Md.App. 239, 252, 528 A.2d 510 (1987), cert. denied, 311 Md. 286, 533 A.2d 1308 (1987)(quoting *Brooks v. State*, 68 Md.App. 604, 515 A.2d 225 (1986)). We now turn to the points raised by appellant.

■ With regard to the first point, the testimony was clearly not being offered for the truth of the matter asserted, i.e., that the allegations were "unfounded" and was, therefore, not hearsay.[23] With regard to the second point, this ground

---

23. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to*

for objection was not raised during trial and was, therefore, not preserved for our review.

In support of the third point, appellant relies on the case of *Reynolds v. State,* 98 Md.App. 348, 633 A.2d 455 (1993). *Reynolds* involved a prosecution for child abuse, fourth degree sex offense, assault, and battery. On appeal, Reynolds challenged the admission of medical records containing evaluations and conclusions that the victim had been sexually abused on the grounds that they violated his right to confrontation. The records were offered to prove that certain medical providers had concluded that the victim had been abused. *Id.* at 360, 633 A.2d 455. The Court determined that the records lacked an adequate factual foundation to be admitted within the medical record exception to the hearsay rule. *Id.* at 360, 633 A.2d 455. Furthermore, because they lacked the requisite factual basis, the records were nothing more than an opinion by the medical professional that the victim was telling the truth and the defendant was lying. *Id.* The Court held that the defendant had a right to confront the healthcare providers whose opinions were being offered through the records to challenge the basis of their opinions. *Id.* at 361, 633 A.2d 455.

Appellant's reliance on *Reynolds* is misplaced. This case is distinguishable from *Reynolds* because the opinions contained in the *Reynolds* reports were offered to prove an element of the crime charged. The testimony in the case at bar was offered to show the effect that the closing of the investigations had on appellant. Whether the underlying accusations of sexual abuse were true or not is, at best, collateral and more likely irrelevant.

Appellant further argues that she should have been permitted to question the witnesses regarding the basis for their opinions that the case should be closed "unfounded" because one of the witnesses testified that "unfounded" meant that the police had evidence that the reports were false. Appellant

---

*prove the truth of the matter asserted."* Md Rule 5–801(c)(emphasis added).

continues by saying "the State in essence, was allowed to have it both ways. The trial judge allowed the State to put the witness' opinion before the jury, and then prevented defense counsel from cross-examining the witness about those opinions." On the contrary, we think it is appellant who is trying to have it both ways. Appellant objected to the testimony in question and had it stricken from the record. It would be wholly inconsistent to sustain the objection and then allow appellant to cross-examine the witness on the objectionable material.

We hold that the trial court properly controlled the scope of the testimony offered and committed no error. When the testimony strayed beyond the proper scope, the court instructed the jury to disregard the testimony and reminded them that the testimony was only to be considered for its effect on appellant's state of mind.

### (4) Financial Conveyances

 Appellant's final argument with regard to "character evidence" is that the State was improperly allowed to offer testimony of financial transactions between appellant and Ms. Landry. Appellant argues that the testimony created an inference that the two women had fraudulently conveyed assets between themselves during the divorce litigation. The State counters that the testimony was offered to show the closeness of the two women.

Having reviewed the testimony of the State's witness, we hold that any inference of criminality that may have been created by the testimony was dispelled on cross-examination. The State's witness testified that the two women were allowed to conduct the transaction, that is, that there was nothing illegal about the transfers. We agree the probative value of the testimony is marginal. It does not, however, amount to reversible error.

### VI. Self–Defense Instruction

 Appellant's sixth ground on appeal is that the trial court erred in not giving appellant's requested "self-defense" jury instruction. This argument is fundamentally flawed.

■ It is an unassailable fact of law that to qualify for a self-defense instruction the defendant, except in very limited circumstances, must not have been the first aggressor. *See Sydnor v. State*, 365 Md. 205, 216, 776 A.2d 669 (2001); *Roach v. State*, 358 Md. 418, 429, 749 A.2d 787 (2000); *State v. Faulkner*, 301 Md. 482, 485, 483 A.2d 759 (1984); *Cunningham v. State*, 58 Md.App. 249, 254–56, 473 A.2d 40 (1984), cert. denied 300 Md. 316, 477 A.2d 1195 (1984). "An aggressor, faced even with the reasonable belief in the necessity to kill, cannot have the defense of self-defense, for that requires both freedom from fault in the inception of the difficulty and the entertainment of beliefs which are reasonable." *Cunningham*, 58 Md.App. at 256, 473 A.2d 40 (quoting W. LaFave and A. Scott, *Criminal Law*, p. 583 (1972)).

■ The narrow set of circumstances that allow a first aggressor to take advantage of a self-defense instruction are of no benefit to appellant. To overcome her first aggressor status, appellant would have had to demonstrate that she, or Landry as the case may be, was a nondeadly aggressor and that she, in good faith, effectively withdrew from any further encounter with the victim. *Cunningham*, 58 Md.App. at 254, 473 A.2d 40 (internal citation omitted). Appellant did not, indeed, cannot meet this requisite burden.

Appellant asserts that "the evidence in this case generated a version of events that was contrary to the version provided by Mr. Slobodow" and the variance entitled appellant to the requested jury instruction. Appellant points to the location of the bullet holes in the wall above the bed and the lack of blood on the sheets for support. Assuming, *arguendo*, that appellant's "what if" version of the struggle was true, it would still not entitle appellant to a self-defense instruction. Regardless of what transpired in the victim's bedroom once he awoke, appellant cannot explain away Landry's presence in the victim's bedroom with a loaded, untraceable gun. The law is clear, having broken into the victim's home with a gun, Landry was a deadly aggressor.

Appellant invites this Court to engage in a fanciful game of "what if" in which we imagine a scenario that would entitle Landry, and appellant by association, to a self-defense instruction. This Court, however, does not base its holdings on "what ifs." The facts of this case clearly indicate that Landry was a first aggressor, and as such, was not entitled to a "self-defense" jury instruction. The trial court properly declined to give the requested jury instruction.

## VII. Sufficiency of the Evidence

 Appellant's penultimate basis for appeal is that there was insufficient evidence upon which the jury could find appellant guilty of any of the crimes charged.

 The standard of appellate review on a sufficiency of the evidence claim is firmly established. "To set aside the jury's verdict we must be able to say there was no legally sufficient evidence from which the jury could find [appellant] guilty beyond a reasonable doubt." *Veney v. State,* 251 Md. 159, 174, 246 A.2d 608 (1968)(citing *Pressley v. State,* 244 Md. 664, 667, 224 A.2d 866 (1966)).

 In support of her claim, appellant presents a number of alternative ways in which the evidence presented at trial could be viewed. This argument fails, however, because this Court does not review a jury verdict to determine if they rendered the only possible outcome or even the most logical. Rather, we view the evidence to determine if "any rational trier of fact could have found the essential elements ... beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We conclude that there was ample evidence upon which the jury could find that appellant and Ms. Landry conspired to kill Arlen Slobodow.

The testimony established that appellant and Ms. Landry were extremely close and involved in each other's lives. Both women had motive to kill the victim, as they believed that he was sexually abusing the children that they loved. The court system, in their view, was failing to protect the children from

the abuse. Appellant's growing frustration with the system was evident. Furthermore, there was testimony that the two women had conspired in front of other people. Based on the evidence presented at trial, we do not hesitate to hold that there was sufficient evidence to support appellant's conviction.

## VIII. Motion for a New Trial

Appellant's last ground for appeal is that the trial court erred in denying her motion for a new trial based on newly discovered evidence pursuant to Md. Rule 4–331(c).

The newly discovered evidence appellant relies on is testimony by appellant's co-conspirator, Margery Landry. Landry was called as a witness by the defense, but she exercised her Fifth Amendment right to remain silent. Appellant sought immunity for Landry from the State, but the State denied to grant immunity. Appellant argues that Landry's testimony would rebut the State's argument that Landry was "controlled" by appellant. It would also establish Landry's independent motive for the crime and corroborate appellant's version of the struggle in the bedroom. Most importantly, Landry would deny the existence of a conspiracy.

As a preliminary matter, appellant asks this Court to apply a more stringent standard of review than is generally applicable to appeals of motions for a new trial. Citing *Merritt v. State*, 367 Md. 17, 30–31, 785 A.2d 756 (2001), appellant argues that, in certain circumstances, some denials of a motion for a new trial are reviewed for error rather than abuse of discretion. Accordingly, Appellant asks this Court to review the decision for error.

The Court in *Merritt* discussed a number of situations in which a trial court's decision should be reviewed for error instead of abuse of discretion. The Court discussed three situations in which error was the proper standard. They are: (1) where the trial court refused to even consider the newly discovered evidence; (2) where the newly discovered evidence clearly indicates that the jury was misled; and (3) where an error is committed during the trial but, through no fault of the

defense, is not discovered until after the trial. *Id.* at 30–31, 785 A.2d 756.

We find none of the expressed exceptions applicable to the case at bar. We further find that this case does not present any issues that would qualify as a functional equivalent to the expressed situations. We, therefore, hold it is appropriate to apply the abuse of discretion standard in evaluating the trial judge's denial of a motion for a new trial. See *Baker v. State,* 367 Md. 648, 696, 790 A.2d 629 (2002) and cases cited therein.

Motions for a new trial based on newly discovered evidence are governed by Md. Rule 4–331(c) and case law. *See Argyrou v. State,* 349 Md. 587, 600–01, 709 A.2d 1194 (1998). The Rule reads:

> (c) The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule.[24]

The case law requires the trial court to determine (1) whether the new evidence is of a type that could not have been discovered by due diligence in time to satisfy Md. Rule 4–331(a); and (2) that the evidence " 'may well have produced a different result, that is, there was a substantial or significant possibility that the trier of fact would have been affected.' " *Jackson v. State,* 358 Md. 612, 626, 751 A.2d 473 (2000)(quoting *Yorke v. State,* 315 Md. 578, 588, 556 A.2d 230 (1989)). In discussing the two-prong requirements, the Court in *Jackson* noted that the first prong is "essentially a factual one," and the second is a "judgmental one." *Jackson,* 358 Md. at 626, 751 A.2d 473. See also *Baker v. State,* 367 Md. 648, 695–96, 790 A.2d 629 (2002)(discussing the burden of obtaining a new trial based on newly discovered testimony). Furthermore, the "new" evidence must be material to the result, that is, it cannot be " 'merely cumulative or impeaching.' " *Argyrou,*

---

**24.** Section (a) requires a motion for a new trial to be filed within 10 days after a verdict is entered.

349 Md. at 601, 709 A.2d 1194 (quoting *Jones v. State*, 16 Md.App. 472, 477, 298 A.2d 483 (1973)).

The determination that the evidence qualifies as newly discovered within the meaning of Md. Rule 4–331(c) is a threshold question that must be answered before the significance of the evidence may be weighed. *Argyrou*, 349 Md. at 602, 709 A.2d 1194. *See also Love v. State*, 95 Md.App. 420, 432, 621 A.2d 910 (1993)("Unless and until there is found to be 'newly discovered evidence which could not have been discovered by due diligence,' one does not weigh its significance.").

The Court in *Argyrou* discussed the meaning of newly discovered evidence. It determined that there are two aspects to the inquiry. First, "when was the evidence discovered?" And second, "when should or could [the evidence] have been discovered?" *Argyrou*, 349 Md. at 602, 709 A.2d 1194. In evaluating the second aspect, and the meaning of "due diligence" in particular, the Court instructed trial judges to determine if the defendant "acted reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and the facts known to him or her." *Id.* at 605, 709 A.2d 1194.

Turning now to the case at bar, we find that Landry's testimony would be deemed newly discovered within the meaning of the Rule. We rely on the case of *Jackson v. State*, 358 Md. 612, 751 A.2d 473 (2000). The issue before the Court of Appeals in *Jackson* was whether the trial court erred in denying Jackson's motion for a new trial based on newly discovered evidence without a hearing. *Id.* at 614, 751 A.2d 473.

Jackson and her boyfriend, Corey Williams, were found guilty of felony murder for the death of Claude Bowlin. Jackson claimed, throughout the trial, that the murder was a frolic of Williams and not in furtherance of anything she planned. She also denied that she had anything to do with "gagging" the victim. Jackson was found guilty and eventually filed a motion for a new trial based on newly discovered evidence. The new evidence was a note from Williams admit-

ting that he had gagged Bowlin and that he was willing to take the stand and so testify. The trial court denied the motion without a hearing.

On appeal, the Court of Appeals held that the trial court erred in not granting Jackson a hearing on the issue of newly discovered evidence. The Court also found that the evidence could qualify as newly discovered. In rejecting the Court of Special Appeals' determination that the evidence was not newly discovered, the Court noted:

There is no compelling evidence that testimony from Williams that he, not petitioner, gagged the victim was, or in the exercise of due diligence could have been, available to petitioner prior to July, 1998, when her first motion was decided. Although Williams had by then been convicted, his appeal was still pending in the Court of Special Appeals, and, although he ultimately chose to make this admission before his appeal was resolved, it was not the kind of admission he could reasonably be expected to make while his appeal was still pending.

*Jackson,* 358 Md. at 626, 751 A.2d 473.

At the motion hearing held on January 17, 2003, appellant's counsel informed the court that they had attempted to obtain a statement from Landry prior to trial but had been barred from communicating with her by Landry's attorney. They then attempted to call Landry as a witness at the trial but she exercised her Fifth Amendment right to remain silent, and the State declined to grant Landry immunity. The trial court concluded that Landry's testimony was not newly discovered within the Rule.

We think it clear that appellant exercised due diligence in attempting to obtain Landry's testimony. Like Williams, Landry could not reasonably have been expected to make a statement implicating herself and exonerating appellant before her own culpability had been determined. Consequently, we hold that Landry's proposed testimony is newly discovered within the meaning of the Rule.

Appellee argued at the hearing on the motion that to reach the outcome we do today would result in a circle of trials whereby a co-conspirator could exonerate another co-conspirator after a trial resulting in yet another trial. We are cognizant of this potential outcome but do not think it as dire a result as appellee does. First, the determination that the evidence is newly discovered is only the first prong of the new trial test. The Court is still required to determine whether the new evidence would likely result in a different outcome and if it would not, then the motion should be denied. Second, if the trial court finds that the evidence would have a "substantial or significant possibility" of affecting the outcome, then we think justice requires the new trial. This is true even when the exonerating statement comes from a co-conspirator.

As we noted earlier, the trial court concluded the testimony was not newly discovered within the Rule. Nevertheless, the court determined that even if the testimony was newly discovered, it would not have a substantial or significant possibility of affecting the outcome of the trial. We agree.

In determining whether the new evidence would likely affect the outcome of the trial, the trial court is granted wide discretion. *Argyrou*, 349 Md. at 587, 709 A.2d 1194. The court has the authority to weigh the evidence and consider the credibility of witnesses in making its determination. *Id.* (citing *Yorke v. State*, 315 Md. 578, 582, 556 A.2d 230 (1989)).

During the hearing on the motion for a new trial, the court accepted a proffer from appellant as to what Landry would say if called as a witness at the new trial. He also reviewed the transcript of Landry's sentencing hearing and appellant's trial testimony. After reviewing the evidence and listening to counsel's arguments, the court concluded that:

In weighing the evidence provided by Ms. Landry and the credibility of that evidence, it is my determination that this evidence would not affect the outcome of the trial. In many respects, it is cumulative of Ms. Newman's testimony.

Moreover, it impeaches her testimony in several critical areas.

The court considered the fact that appellant testified that she did not conspire with Landry to do anything on January 7. Landry, however, testified at her sentencing, and explained in a letter to the court, that she had discussed her plan to enter Slobodow's house on January 7 with appellant. Other contradictory testimony included whether the two spoke on the day of the shooting. Appellant claims they did not speak while Landry claims that they did. The court also determined that Landry was not a credible witness and the testimony she offered was neither trustworthy nor believable. Landry maintained that she did not attempt to kill Slobodow, but this claim is belied by the fact that she broke into his house with a loaded, untraceable gun. Furthermore, the court found that the argument that appellant had nothing to do with the events of the 7th is not credible.

On the other side of the equation, the court determined that the State's evidence was highly credible; specifically, the testimony of Slobodow, Friedman, and Ashley. The Court concluded that,

> there is not a substantial or significant possibility that the jury's verdict in this case would have been affected by the testimony of Landry. Taking all of the testimony and the evidence, weighing the credibility of the witnesses, reviewing all the evidence in this case, everything that has been presented, I conclude that a motion for new trial should not be granted.

We find that the trial court properly exercised its discretion in denying the motion for a new trial. The court properly weighed the affect of the new evidence on a jury and determined that it would not have changed the outcome of appellant's trial.

## Motion to Strike Appendix

The final issue in this matter that requires our attention is a motion by the State to have tabs 13 through 16 of appellant's appendix struck.

Maryland Rule 8–504(b) provides: "The appellant shall reproduce, as an appendix to the brief, the pertinent part of every ruling, opinion, or jury instruction of each lower court that deals with points raised by the appellant on appeal." The material contained within the tabs includes the final report of information on appellant's computer, surveillance reports, letters to Judge Rupp from Landry, and trial testimony.

We appreciate appellant's response that the additional material, all part of the record below, was provided in the appendix as a courtesy to this Court. The information contained in tabs 13 through 16, however, falls outside of the Rule. Accordingly, we grant the State's motion to strike tabs 13 through 16 of the appendix to appellant's brief.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**